MESCH, CLARK & ROTHSCHILD, P.C.
259 North Meyer Avenue
Tucson, Arizona 85701
Phone: (520) 624-8886
Fax:   (520) 798-1037
Email: mmcgrath@mcrazlaw.com
       fpetersen@mcrazlaw.com

By:   Michael McGrath, # 6019
      Frederick J. Petersen, #19944
      76155-1

Proposed Attorneys for Debtors

UNITED STATES BANKRUPTCY COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>PRM FAMILY HOLDING COMPANY, L.L.C.,<br><br>Debtor. | Chapter 11 Proceedings<br><br>No. 2:13-bk-09026-SSC |
| In re:<br><br>PRODIGIO MERCADO, L.L.C.,<br><br>Debtor. | No. 2:13-bk-09028-DPC |
| In re:<br><br>PRO'S ABQ RANCH MARKETS, L.L.C.,<br><br>Debtor. | No. 2:13-bk-09030-GBN |
| In re:<br><br>PRO'S ELP RANCH MARKETS, L.L.C.,<br><br>Debtor. | No. 2:13-bk-09033-RJH |

| | |
|---|---|
| In re:<br><br>PRO'S ELP RANCH MARKETS BEVERAGE COMPANY, L.L.C.,<br><br>Debtor. | No. 2:13-bk-09034-RJH |
| In re:<br><br>PRO & SON'S, L.L.C.,<br><br>Debtor. | No. 2:13-bk- 09036-RJH |
| In re:<br><br>PRO'S RANCH MARKETS (CA), L.L.C.,<br><br><br>Debtor. | No. 2:13-bk-09037-GBN |
| In re:<br><br>PROVENZANO'S, L.L.C.,<br>Debtor. | No. 2:13-bk-09039-SSC |

## DECLARATION OF MICHAEL PROVENZANO III IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

MICHAEL PROVENZANO, III, declares as follows:

1) I am an authorized representative and officer of PRM Family Holding Company L.L.C., together with Prodigio Mercado, L.L.C., Pro's ABQ Ranch Markets, L.L.C., Pro's ELP Ranch Markets, L.L.C., Pro's ELP Ranch Markets Beverage Company, L.L.C., Pro & Son's L.L.C., Pro's Ranch Markets (CA), L.L.C., and Provenzano's L.L.C., (collectively the "Debtors", "PRM" or "Pro's Ranch Markets").

2) I am familiar with the Debtors' general business and financial affairs. I submit this Declaration on personal knowledge of the Debtors in connection with the Debtors' voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code, filed

Case 2:13-bk-09026-SSC    Doc 9    Filed 05/28/13    Entered 05/28/13 18:16:17    Desc
Main Document    Page 2 of 14

on May 28, 2013 (the "Petition Date"). The statements set forth below are true to the best of my knowledge and if called to testify as to those statements, I could do so competently.

3) This Declaration is submitted in support of the factual allegations contained in the following Motions (collectively the "First Day Motions"), filed contemporaneously with this Declaration:

- Expedited Motion for Joint Administration and Motion to Transfer Assignment of Cases to One Judge;

- Motion for Interim and Final Orders Determining Adequate Assurance of Payment of Future Utility Services;

- Motion to Establish Procedures and to Allow Claims of Perishable Agricultural Commodities Act Claimants and Packers and Stockyards Act Claimants;

- Emergency Motion for Order Granting Interim Use of Cash Collateral and Setting Final Hearing;

- Motion to (i) Establish Procedures and Allow Payments of Western Union Trust Funds and (ii) Establish Procedures and Allow Payments of Lottery Trust Funds; and

- Emergency Motion Authorizing Payment of Pre-Petition Wages, Salaries, and Employee Benefits.

### **DESCRIPTION OF THE DEBTORS**

4) On the Petition Date, the Debtors filed voluntary Petitions for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et. seq.* (as amended) (the "Bankruptcy Code"), which cases are pending before the United States Bankruptcy Court for the District of Arizona (the "Court").

5) The Debtors have continuously been in the grocery store business for more than 30 years, since 1982.

6) The Debtors' collectively currently operate eleven stores comprised of seven stores in Phoenix, Arizona, two stores in El Paso, Texas, and two stores in New Mexico (Albuquerque and Las Cruces), as well as an 80,000 square foot corporate office, warehouse and distribution facility in California and a 151,000 square foot warehouse and distribution facility in Phoenix. Pro's Ranch Markets feature produce, baked goods, in-house tortillerias, hot foods, meats, and general grocery items with a Hispanic flair and theme. The stores are known for their high quality amenities and customer service.

7) The Debtors' stores offer an upscale Hispanic foods shopping experience. This includes familiar brand names and brand names imported from Mexico, Central and South America. Additionally, the grocery markets provide marinated cuts of meat, creamerias with specialty cheeses from throughout Central and South America, tortillerias that make fresh homemade tortillas throughout each day, and cocinas that provide made to order Hispanic dishes.

8) Pro's Ranch Markets are recognized throughout the grocery industry for their innovative practices. In 2012 the Debtors were recognized as the Arizona Retailer of the Year - Arizona Food Marketing Alliance. In addition the Debtors have been previously honored with the following awards:
- 2011 - Supermarket News Technology Excellence Award
- 2011 - Arizona Republic Critics Pick: Best Grocery For Dining
- 2009 - Thomas K. Zaucha Entrepreneurial Excellence Award
- 2007 - Finalist Orange County Ernst & Young Entrepreneur of the Year
- 2006 - The Ben Schwartz Retail Grocery Visionary Award
- 2005 - Hispanic Retail Excellence Award - Hispanic Retail 360
- 2004 – Arizona Retailer of the Year – Arizona Food Marketing Alliance

9) PRM Family Holding Company, L.L.C., is a Delaware limited liability company. It is the sole member of the other limited liability company Debtors.

10) Prodigio Mercado, L.L.C. is an Arizona limited liability company that operates three grocery stores numbered 1, 5 and 6 located in Phoenix, Arizona.

11) Provenzano's L.L.C. is an Arizona limited liability company that operates four grocery stores numbered 2, 3, 4 and 7 located in Phoenix, Arizona.

12) Pro's ABQ Ranch Markets, L.L.C. is a New Mexico limited liability company that operates two grocery stores located in New Mexico, one in Albuquerque and one in Las Cruces.

13) Pro's ELP Ranch Markets, L.L.C. is a Texas limited liability company that operates two grocery stores located in El Paso, Texas.

14) Pro's ELP Ranch Markets Beverage Company, L.L.C. is a Texas limited liability company that holds the liquor license for Pro's ELP Ranch Markets, L.L.C.

15) Pro & Son's, L.L.C. is a California limited liability company that holds title to intellectual property owned by the Debtors.

16) Pro's Ranch Markets (CA), L.L.C. is a California limited liability company that acts as the paymaster, manager, internal wholesaler, oversees trucking and distribution, pays all AP's, and provides employees to all of the Debtors' stores.

17) Collectively the Debtors employ approximately 2,235 full and part time workers in their 11 stores, and other locations.

## THE DEBTORS' CAPITAL STRUCTURE

18) On or about August 11, 2006, the Debtors and Bank of America, N.A. ("Bank of America"), as the administrative agent, lender and letter of credit issuer entered into that Certain Credit Agreement as amended from time to time (the "Existing Credit Agreement"). On July 11, 2011, the Existing Credit Agreement was amended and restated in its entirety (the "Amended and Restated Credit Agreement").

19) The Amended and Restated Credit Agreement anticipated a Revolving Credit Loan, a Term B Loan, Letters of Credit and a Swing Line Loan. Pursuant to the terms of the

Amended and Restated Credit Agreement, these obligations were to be secured by, among other things, a pledge of the Debtors' interest in certain personal property collateral.

20) On May 12, 2012, the Debtors', among others, entered into a First Amendment to the Amended and Restated Credit Agreement (the "First Amendment"). The First Amendment provided, *inter alia,* that Bank of America waived certain Events of Default and it amended the definition of "Applicable Rate" regarding the rate of interest applicable under various provisions of the Amended and Restated Credit Agreement.

21) On August 13, 2012, the Debtors, among others, and Bank of America entered into a second amendment to the Amended and Restated Credit Agreement (the "Second Amendment").

22) On September 30, 2012, Bank of America and the Debtors entered into a Forbearance Agreement. This agreement provided, among other things, that Bank of America agreed to forbear from exercising any rights and remedies under the prior loan agreements described above (the "Credit Agreement") until October 30, 2012.

23) On October 17, 2012, the Debtors and Bank of America entered into a Forbearance Agreement and Amendment to Amended and Restated Credit Agreement (the "Forbearance Agreement"). The Forbearance Agreement provided that, among other things, Bank of America agreed: (i) to forbear until December 31, 2012 from exercising any rights and remedies available under the Credit Agreement; (ii) to provide additional Term B Loans in the aggregate principal amount of $3.3 million; (iii) to amend the Credit Agreement so that the principal amount owed for Term B Loans was increased to $8.3 million; and (iv) the principal amount owed for the Revolving Credit Loans was $39.6 million plus Letter of Credit Obligations.

24) On or about February 13, 2013, Bank of America declared a default under the terms of the Credit Agreement.

25) The Debtors assert the value of their personal property securing Bank of America's loans pursuant to the terms of the Credit Agreement is substantially less than the amounts owed as of the Petition Date.

26) As a further impairment, the Debtors have significant obligations owing to PACA and PASA creditors, who have trust fund claims against the debtors' inventory, cash and accounts that are senior to the claims and collateral interests of the Bank.

## EVENTS LEADING TO CHAPTER 11 FILING

27) No single event has caused the Debtors to seek relief under Chapter 11 of the Bankruptcy Code. Rather, the Debtors have experienced several events and circumstances combined with the Debtors' Lenders refusing further advances of funds and charging the Debtors forbearance fees, substantial consulting fees and default interest. The cash strains resulting from these actions burdened the Debtors' business and has necessitated a filing and a reorganization of the Debtors' capital structure through the Chapter 11 process.

28) Factors contributing to the adverse and negative impact on the Debtors' business include:

(i) the decline in the U.S. Domestic economy and the profound effect it has had on the Southwest;

(ii) the loss of construction and other blue collar jobs throughout Arizona and New Mexico;

(iii) the adverse, negative, and chilling effect of the perception in the State of Arizona towards immigrants and Hispanics including the passage of SB 1070;

(iv) increased competition from other industry grocery store chains;

(v) the Debtors were effectively singled out for an immigration audit to which no other competitor was subjected; and

(vi) since October 2012, the Debtors' relationship with its bankers changed. Bank of America, which had worked with the Debtors to fund operational shortfalls while the

parties attempted to reach a long-term solution, determined that it will not provide any further advances and began charging substantial fees incurred by their professionals and default interest in excess of $500,000. The cash drain on the Debtors' has proved critical to continued positive operations.

### STATEMENTS IN SUPPORT OF FIRST DAY MOTIONS

29) The following statements are submitted in support of First Day Motions and are based upon personal knowledge or knowledge obtained from employees of the Debtors. The capitalized terms used below shall have the meaning ascribed to such terms in each respective pleading. Defined terms used below shall be limited to the description of each respective motion in which such defined terms are contained.

I. **Expedited Motion for Joint Administration and Motion to Transfer Assignment of Cases to One Judge**

30) The Debtors believe it is in the best interest of all parties and judicial economy and resources that the bankruptcy cases of the related Debtors be overseen by the same judicial officer, Bankruptcy Judge.

31) The Debtors-in-possession share common ownership, corporate/LLC officers, and operations, and the issues to be resolved in these cases are identical.

32) The cost to Debtors-in-possession, if these cases are not jointly administered, could be substantially increased because the creditors will receive duplicate notices and mailings, and the Debtors-in-possession will be required to file duplicative pleadings in each of the respective bankruptcy cases.

II. **Motion for Interim and Final Orders Determining Adequate Assurance of Payment of Future Utility Services**

33) In the normal course of their business, the Debtors use electricity, gas, water, phone, internet and other utility services provided by the respective utility companies.

34) The Debtors' ability to effectively oversee and manage their businesses during the pendency of these cases is dependent on the uninterrupted provisions of services by the utilities, and the Debtors' ability to preserve the value of the estates will be irreparably damaged if the utilities do not continue to provide these services. Any interruption in utility service would severely disrupt the Debtors' business operations, their restructuring efforts, and jeopardize the Debtors' ability to preserve the value of the estates.

35) The Debtors historically have made timely and complete payments with respect to utilities before the Petition Date. As of the Petition Date, the Debtors believe that all utility payments were paid, on a timely basis, in the ordinary course of business.

### III. Motion to Establish Procedures and to Allow Claims of Perishable Agricultural Commodities Act Claimants and Packers and Stockyards Act Claimants

36) In the ordinary course of business, the Debtors rely on goods provided by various suppliers of such goods for the provision of, among other things, produce and other agricultural commodities, meats, and other goods necessary to operate Debtors' retail grocery stores.

37) The Debtors' numerous vendors are the pivotal link in the Debtors' operations. Indeed, many of the Debtors' vendors are "sole source" providers of certain goods. If these vendors refuse to ship additional goods, the Debtors would be left without an available source of supply. The Debtors also lack sufficient goods, in part due to the perishable nature of certain items, to ensure they are able to meet customer preferences while alternative sources of supplies are sought.

38) In the ordinary course of business, the Debtors obtain essential supplies of perishable agricultural commodities including fresh fruits and vegetables from various suppliers who may hold claims pursuant to PACA (each a "PACA Claimant" and together the "PACA Claimants").

39) The Debtors have reviewed their records and identified at least approximately 83 potential PACA Claimants.[1] These PACA Claimants were owed approximately $7,229,772.85 in pre-petition claims potentially subject to PACA (the "PACA Claims") on account of agricultural products delivered to the Debtors prior to the Petition Date. As a result, the Debtors believe that certain vendors are likely to file notices under PACA based on the filing of these Cases.

40) In addition to the PACA Claimants, the Debtors have certain vendors who may assert claims pursuant to PASA as a result of providing the Debtors with beef, swine, and poultry as part of the Debtors' ordinary course of business (each a "PASA Claimant" and together, the "PASA Claimants"). The Debtors purchase bulk beef, swine, and poultry, which the Debtors then offer for sale in its grocery stores.

41) The Debtors have reviewed their records and operations, and believe that they are not subject to PASA. However, the Debtors believe that certain vendors are likely to assert claims under PASA ("the PASA Claims") on account of bulk beef, swine and poultry delivered to the Debtors prior to the Petition Date, and to file notices under PASA based on the filing of these Cases.

### IV. Emergency Motion for Order Granting Interim Use of Cash Collateral and Setting Final Hearing

42) The Debtors propose to provide adequate protection by granting replacement liens on the new inventory purchased by the Debtors and on the proceeds generated from the sale and use of Bank of America's existing accounts, inventory and other collateral, to the same nature, extent and priority as the bank enjoyed prepetition.

---

[1] The identification of these PACA Claimants is not an admission of any PACA liability on the part of the Debtors.

43) The Budget attached to the Motion is accurate and reliable, to the best of the information and knowledge of the Debtors.

## V. Motion to (i) Establish Procedures and Allow Payments of Western Union Trust Funds and (ii) Establish Procedures and Allow Payments of Lottery Trust Funds

44) In their ordinary course of business, Debtors partner with Western Union to provide customers the ability to send money orders, money transactions, and customer utility payments ("Money Orders") from Debtors' stores. Customers purchase the Money Orders from Debtors, and Western Union pays the Money Order amount at the location chosen by the customer. The Debtors earn a small commission on each sale, and hold the rest of the sale proceeds in trust for Western Union ("Western Union Trust Funds"). Sales of these services are cyclical, with more sales occurring at times during each month when customers receive paychecks and when utility bills are generally due. Debtors estimate that as of the filing, they hold in trust approximately $260,000 for the benefit of Western Union. The Debtors do not have an equitable interest in the Western Union Trust Funds.

45) In the ordinary course of business, the Debtors' partner with the state lotteries to sell lottery tickets and lottery products at Debtors' stores. Debtors earn a small commission on each sale, and hold the rest of the sale proceeds in trust for the benefit of the state lotteries ("Lottery Trust Funds"). The Debtors estimate that Lottery Trust Funds held as of the filing are approximately $36,000. The Debtors do not have an equitable interest in the Lottery Trust Funds.

## VI. Emergency Motion Authorizing Payment of Pre-Petition Wages, Salaries, and Employee Benefits

46) The Debtors collectively employ approximately 2,235 employees as of the Petition Date (the "Employees"), in California, Arizona, New Mexico and Texas.

47) The Employees perform a variety of critical functions, related to the operation of the Debtors' business. The Employees' skills, knowledge, and understanding of the Debtors' business are among the Debtors' most valuable assets.

48) The employees of the Debtors are critical to its business. All employees receiving payment pursuant to this Motion will be retained in the ordinary course of the Debtors' business.

49) The accrued pre-petition obligations owing to individual Employees will be substantially less than the statutory priority cap of $12,475.00 that is set by Bankruptcy Code §§ 507(a)(4) and (a)(5) of the Bankruptcy Code. The Motion regarding payment of Employees only seeks authorization to satisfy accrued pre-petition obligations owing to individual Employees up to the statutory cap of $12,475.00.

50) Debtors' Employee Obligations and Employee Benefits include salaries and wages, payroll taxes, payroll deductions and withholdings, vacation, sick, and holiday time, retirement obligations, health insurance premiums and contributions, and life premiums and contributions. The Debtors customarily either paid or withheld all of these Employee Obligations and Employee Benefits in the ordinary course of business.

51) Each Friday the Employees receive payment for hourly wages or salaries earned through the preceding Sunday. The Debtors' last pay period commenced Monday, May 19, 2013 and ended Sunday, May 26, 2013. In the ordinary course of business, this pay period would be paid on Friday, May 31, 2013. In addition, the Debtors owe wages and salaries for the pay period commencing on May 27, 2013 through the Petition Date that would ordinarily be paid on Friday June 7, 2013. Wages and salaries for work performed from May 6, 2013 through May 19, 2013 was paid in the ordinary course of business on May 24, 2013. The Debtors seek to pay pre-petition wages on May 31 and June 7, 2013 totaling approximately $879,050.62 each week, which amount includes the wages of Rick Provenzano, Steve Provenzano, Jeff Provenzano, Michael Provenzano Jr., and Michael

Provenzano III, which collectively total $23,298.31. No employee will be paid more than the statutory limit of $12,475.

52) The Debtors are required by law to withhold from each Employee's paycheck certain amounts related to federal, state, and local income taxes as well as social security and Medicare taxes (collectively, the "Withholding Taxes") for remittance to the appropriate taxing authorities. The Debtors must also match from their own funds social security and Medicare taxes withheld, and pay (based on a percentage of gross payroll) additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes" and, together with the Withholding Taxes, the "Payroll Taxes"). The Debtors seek authority to fund all such Payroll Taxes in the ordinary course of business.

53) The Debtors provide their Employees with health insurance benefits. The Debtors seek authority to satisfy all of their pre-petition obligations related to the health benefits (e.g. to pay any pre-petition insurance premiums that remain outstanding as of the Petition Date) and to remit all withholdings associated with such employee benefits.

54) The Debtors maintain workers' compensation insurance for each of their eligible employees. The Debtors seek authority to continue to remit such insurance payments, as well as refer any claims, in the ordinary course of business.

55) The Debtors offer their Employees certain benefits including vacation time, sick time and paid time off that the employees accrue based on time worked. The Debtors seek authority to continue to honor these Employee Benefits in the ordinary course of business.

56) If pre-petition compensation and benefits are not received by the Employees in the ordinary course of business, they will suffer substantial personal hardship and unnecessary distraction from their duties, which may result in diminished Employee morale and unmanageable Employee turnover and resignation.

57) The Debtors' ongoing business operations would suffer immediate and pervasive damage. The harm to Employees would adversely affect the Debtors and their ability to function, resulting in irreparable harm to the Debtors and their estates.

Dated: May 28, 2013

_____
Michael Provenzano, III

366435