FREEBORN & PETERS LLP
Richard S. Lauter, Esq. (Illinois Bar No. 6182859)
Thomas R. Fawkes, Esq. (Illinois Bar No. 6277451)
311 South Wacker Drive, Ste. 3000
Chicago, IL 60606
Telephone: 312.360.6000
Facsimile: 312.360.6520

SCHIAN WALKER, P.L.C.
Dale C. Schian, #010445
Cody J. Jess, #025066
1850 North Central Avenue, #900
Phoenix, AZ 85004-4531
Telephone: 602.277.1501
Facsimile: 602.297.9633
E-Mail: ecfdocket@swazlaw.com

Counsel for the Official Committee of Unsecured
Creditors of PRM Family Holding Company L.L.C.,
*et al.*

and

MESCH, CLARK & ROTHSCHILD, P.C.
Michael McGrath, #6019
259 North Meyer Avenue
Tucson, AZ 85701
Telephone: 520.624.8886
Facsimile: 520.798.1037
E-Mail: mmcgrath@mcrazlaw.com

Counsel for PRM Family Holding Company, L.L.C.,
*et al.*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| PRM FAMILY HOLDING COMPANY, L.L.C., *et al.*,<br><br>       Debtors. | Chapter 11<br><br>Case No. 2:13:-bk-09026-BKM<br><br>(Jointly Administered) |
| This Filing Applies to:<br><br>☒ All Debtors<br>☐ Specified Debtors | |

**DISCLOSURE STATEMENT WITH RESPECT TO JOINT PLAN OF LIQUIDATION OF PRM FAMILY HOLDING COMPANY, L.L.C., ET AL., PURSUANT TO 11 U.S.C. § 1125, DATED DECEMBER 30, 2014**

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

00258302.2

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 2

II.   SUMMARY OF THE PLAN ................................................................................ 5

III.  VOTING AND CONFIRMATION PROCEDURES .......................................... 9
      A. Voting Procedures ...................................................................................... 10
      B. Confirmation Hearing................................................................................. 11

IV.   GENERAL INFORMATION ............................................................................ 12
      A. Description and History of the Debtors' Business ..................................... 12
      B. The Pre-Petition Secured Indebtedness ..................................................... 13
      C. Events Leading to the Debtors' Filing for Chapter 11 Relief .................... 16

V.    THE CHAPTER 11 CASES .............................................................................. 17
      A. Committee Participation in the Cases......................................................... 17
      B. Relevant Chapter 11 Filings ...................................................................... 17

VI.   FINANCIAL INFORMATION ......................................................................... 23
      A. Assets ......................................................................................................... 23
      B. Liabilities ................................................................................................... 25

VII.  PLAN OF LIQUIDATION ............................................................................... 27
      A. Objectives of the Plan................................................................................ 27
      B. Means of Implementation of the Plan ....................................................... 28

VIII. STATUS AND EXISTENCE OF EXECUTORY CONTRACTS AND OTHER
      LITIGATION ................................................................................................... 35
      A. Executory Contracts ................................................................................... 35
      B. Litigation .................................................................................................... 36
      C. Objections to Claims .................................................................................. 38

IX.   CONFIRMATION AND CONSUMMATION PROCEDURE .......................... 38
      A. Solicitation of Votes................................................................................... 38
      B. The Confirmation Hearing ......................................................................... 40
      C. Confirmation .............................................................................................. 40

X.    TAX CONSEQUENCES ................................................................................... 44

XI.   RISK FACTORS................................................................................................ 45
      A. Failure to Satisfy Vote Requirement .......................................................... 45
      B. Non-Consensual Confirmation ................................................................... 45
      C. Risk of Non-Occurrence of the Effective Date .......................................... 46
      D. Risk of Inability to Pay All Allowed Priority Tax Claims and Allowed Administrative
         Claims ........................................................................................................ 46
      E. Amount of Allowed Claims........................................................................ 46

XII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN..... 46

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

A. Alternative Plan(s) of Liquidation ................................................................ 47

B. Chapter 7 Liquidation of the Debtors ............................................................ 47

XIII. CONCLUSION ................................................................................................ 48

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

- ii -

# I. INTRODUCTION

The Official Committee of Unsecured Creditors (the "*Committee*") and the Debtors (collectively the "*Plan Proponents*") hereby submit this disclosure statement (the "*Disclosure Statement*") to holders of Claims against and interests in the Debtors in connection with the solicitation of acceptances of the Joint Plan of Liquidation Dated December 30, 2014, as the same may be amended (the "*Plan*"). Unless otherwise defined herein, all capitalized terms contained herein have the respective meanings assigned to them in the Plan.

This Disclosure Statement describes certain aspects of the Plan, the Debtors' chapter 11 cases (the "*Cases*"), the Debtors' liquidation and wind-down and the formation of the Creditor Trust. The Plan proposes the following treatment: holders of allowed CNG Secured Claims, allowed secured tax claims and allowed other secured claims will be paid in full. The holders of allowed administrative claims will be paid in full with proceeds as assets of the Estates are liquidated by the Creditor Trustee ("*Creditor Trustee*"), or more quickly in a discounted amount as agreed between the Creditor Trustee and the claim holder. Holders of allowed priority tax claims and other priority claims will be paid in order of priority from the Creditor Trust ("*Creditor Trust*"). Allowed general unsecured claims will be deemed to hold Unsecured Creditor Trust Interests and will receive pro rata distributions from the Creditor Trust, and the Debtors' equity securities will be cancelled and terminated. The Plan will be funded in part by a contribution from related third parties, Provenzano Family members and their respective trusts (together the "*Plan Funding Source*"), in exchange for an acknowledgement, affirmation and ratification that the Estates hold no claims and fully release any claims (actual or contingent) against the Plan Funding Source. The Creditor Trustee will be charged with: (i) pursuing claims and causes of action on behalf of the Creditor Trust; (ii) analyzing and reconciling claims that have been filed against the Debtors' Estates; and (iii) making distributions on account of allowed

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

claims in accordance with the Plan and the Creditor Trust Agreement entered into with respect thereto. For a complete understanding of the Plan, you should read the Disclosure Statement, the Plan and the exhibits and schedules thereto, in their entirety.

The Plan Proponents believe that confirmation of the Plan is in the best interests of all parties, including the Creditors and Estates. Accordingly, the Plan Proponents urge each Creditor that is impaired hereunder, and entitled to vote with respect to the Plan, to vote to accept the Plan. Detailed voting instructions are set forth in Section III.A. of this Disclosure Statement. To be counted, a ballot containing your vote to accept or reject the Plan must be received by counsel to the Committee by no later than 5:00 p.m. (Central Standard Time) on the ballot deadline set forth in the Order Approving this Disclosure Statement.

**NO REPRESENTATIONS CONCERNING THE DEBTORS ARE AUTHORIZED BY THE PLAN PROPONENTS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE THAT ARE OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION. THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECTED TO A CERTIFIED AUDIT. HOWEVER, THE DATA IN THE PLAN PROPONENTS' POSSESSION IS BASED ON THE RECORDS OF THE DEBTORS. THE PLAN PROPONENTS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY, ALTHOUGH EFFORT HAS BEEN TAKEN TO MAKE SURE IT FAIRLY REPRESENTS THE CURRENT POSITION OF THE ESTATES.**

**FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE**

PLAN ITSELF QUALIFIES ALL SUMMARIES. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE, AND ARE SUBJECT TO AND QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENTS.

THIS DISCLOSURE STATEMENT IS PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE SO AS TO PROVIDE "ADEQUATE INFORMATION" TO THE CREDITORS IN THIS PROCEEDING. CREDITORS ARE URGED TO CONSULT WITH THEIR OWN INDIVIDUAL COUNSEL OR EACH OTHER AND TO REVIEW ALL OF THE RECORDS HEREIN IN ORDER TO FULLY UNDERSTAND THE DISCLOSURES MADE, ANY PLANS FILED HEREIN AND ANY OTHER PERTINENT INFORMATION IN THIS PROCEEDING. ANY PLAN WILL BE COMPLEX, ESPECIALLY SINCE IT REPRESENTS A PROPOSED LEGALLY BINDING AGREEMENT, AND ANY INTELLIGENT JUDGMENT CONCERNING ANY PROPOSED PLAN CANNOT BE MADE WITHOUT FULLY UNDERSTANDING THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE FULL COMPLEXITIES OF ANY PLAN PROPOSED HEREIN. THIS DISCLOSURE STATEMENT IS NOT INTENDED TO TAKE THE PLACE OF THE PLAN. EACH CREDITOR IS URGED TO STUDY THE PLAN IN FULL AND TO CONSULT ITS PROFESSIONALS WITH RESPECT TO THE PLAN, ITS TAX IMPLICATION(S) AND ITS EFFECT ON HIS, HER OR ITS RIGHTS.

Any Creditor having questions regarding the Plan or the Disclosure Statement may

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

- 4 -

contact counsel for the Plan Proponents:

Richard S. Lauter, Esq.
Thomas R. Fawkes, Esq.
FREEBORN & PETERS LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
Telephone: 312.360.6000
Facsimile: 312.360.6520
E-Mail: rlauter@freeborn.com
          tfawkes@freeborn.com
*Counsel to Official Committee*
*of Unsecured Creditors*

or

Michael McGrath, Esq.
Frederick J. Petersen, Esq.
MESCH, CLARK & ROTHSCHILD, P.C.
259 North Meyer Avenue
Tucson, AZ 85701
Telephone: 520.624.8886
Facsimile: 520.798.1037
E-Mail: mmcgrath@mcrazlaw.com
          fpetersen@mcrazlaw.com
*Counsel for the Debtors*

      The cost of distributing the Plan and Disclosure Statement as well as the costs, if any, of soliciting acceptances, will be paid from property of the Estates, as defined in the Plan and as allowed by the Bankruptcy Court. The Professional Fees of the Plan Proponents' counsel are not contingent upon the acceptance of the Plan, and are payable as a cost of administration, upon Bankruptcy Court approval.

## II. SUMMARY OF THE PLAN

| General Overview of the Plan | |
| --- | --- |
| **Plan** | Joint Plan of Liquidation Dated December 30, 2014. |
| **Plan Proponents** | The Committee and the Debtors. The members of the Committee are: (i) Valassis; (ii) G H Dairy El Paso; (iii) All American Plastic & Packaging; (iv) Marcus Food Co.; and (v) Hidden Villa Ranch. |
| **General Purpose** | All remaining assets of the Debtors' Estates will be transferred to the Creditor Trust and will be held for the benefit of the holders of (i) Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Priority Claims (to the extent such holders have claims unpaid as of |

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

| | |
|---|---|
| | the Effective Date), and (ii) Allowed General Unsecured Claims. The holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Claims and Allowed General Unsecured Claims will participate pursuant to the priority scheme established by the Bankruptcy Court's Order. The provisions of the Creditor Trust will be implemented under the direction of the Creditor Trustee, who will be designated prior to the Confirmation Hearing. |
| | The Estates hold significant avoidance actions and litigation claims, the transferring of avoidance actions and litigation claims to the Creditor Trust will allow for the value of these assets to be maximized and allow for a potential recovery to general unsecured creditors, as well as full recovery by holders of administrative claims. |
| **Summary of Claims** | |
| **Administrative Claims** | Administrative Expense Claims consist of expenses which are or become allowed under section 503(b) of the Bankruptcy Code and Allowed Professional Fee Claims, which are entitled to priority under section 507(a)(2) of the Bankruptcy Code, and include: (i) any actual and necessary costs and expenses incurred by the Debtors after the Petition Date with respect to preserving the Estates and operating the Debtors' business; (ii) all fees and charges properly assessed against the Estates pursuant to 28 U.S.C. § 1930; and (iii) all Allowed Claims of Creditors as specified in section 503(b)(9) of the Bankruptcy Code ("503(b)(9) Claims"). |
| | It is expected that each holder of an Allowed Administrative Claim will be paid in full from the proceeds of liquidated assets by the Creditor Trust and will be deemed to hold a Creditor Trust Interest on account of its Allowed Administrative Claim. |
| | Each holder of an Allowed 503(b)(9) Claim will receive payments as may be agreed in writing between the Creditor Trustee and the holder of the Allowed 503(b)(9) Claim. It is anticipated that any 503(b)(9) Claims held by the Plan Funding Source, or its related parties, up to the $1.6 million contribution, will be waived without any payment. Any 503(b)(9) Claims held by the Plan Funding Source, above and beyond their $1.6 million contribution, will remain claims at the discounted amount paid for such claims, rather than the face amount of such claims. |
| | The Plan Proponents estimate that as of the Confirmation Date allowed and unpaid Professional Fee claims will approximate $500,000 for the professionals of the Debtors and the Committee. |
| | The Plan Proponents estimate that unpaid allowed Administrative Expense Claims, including 503(b)(9) Claims, but excluding claims waived by the Plan |

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

| | |
|---|---|
| | Proponents, will approximate $1.6 million as of the Confirmation Date. |
| | The Plan Proponents believe that all Administrative Expense Claims will be paid in full , by a pro rata share of each distribution while the Creditor Trust liquidates assets, or as otherwise agreed by the parties. |
| **Priority Claims (Class 1)** | Class 1 consists of all Allowed Priority Claims (other than Priority Tax Claims) that are not Secured Claims and that are entitled to priority in payment under the Bankruptcy Code.  Such Claims constitute Priority Claims only to the extent allowed under sections 507(a)(4) and (5) of the Bankruptcy Code. |
| | Class 1 Priority Claims are impaired under the Plan. Each holder of a Class 1 Priority Claim, to the extent unpaid as of the Effective Date, will be paid in full by the Creditor Trust and will be deemed to hold a Creditor Trust Interest on account of its Allowed Priority Claim. |
| | The Plan Proponents believe that the only priority claim asserted against the Debtors is by CIGNA, which will not exceed $400,000.00 as of the Confirmation Date, and which is disputed by the Plan Proponents.  In addition, certain general unsecured creditors may have asserted Priority Claims without a valid basis, and such claims are also subject to dispute.  The estimated recovery by Class 1 Priority Claims, if any, will depend upon the Creditor Trust's liquidation of remaining Estate assets, including Causes of Action. |
| **Priority Tax Claims (Class 2)** | Class 2 Priority Tax Claims consist of Unsecured Claims of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code. |
| | Class 2 Priority Tax Claims are impaired under the Plan. Each holder of a Class 2 Priority Tax Claim will be deemed to hold a Creditor Trust Interest on account of its Allowed Priority Tax Claim. |
| | Each holder of an Allowed Priority Tax Claim, to the extent unpaid as of the Effective Date, will be paid in full by the Creditor Trust and will be deemed to hold an Creditor Trust Interest on account of its Allowed Priority Tax Claim. |
| | The Plan Proponents estimate that Allowed Priority Tax Claims will not exceed $523,000.00 as of the Confirmation Date. |
| | The recovery by Allowed Priority Tax Claimants will depend upon the Creditor Trust's liquidation of remaining Estate assets, including Causes of Action. |
| **Secured Claims (Classes 3a, 3b and 3c)** | Class 3a consists of the CNG Secured Claim. |
| | The CNG Secured Claim is unimpaired under the Plan.  In full and complete satisfaction of Class 3a Claims, the |

| | |
|---|---|
| | holder of the Allowed Class 3a Claim has received the Debtors' assets securing the Class 3a Claim. CNG has waived the CNG Unsecured Claim. |
| | Class 3b consists of Secured Tax Claims. |
| | The Secured Tax Claims are unimpaired under the Plan. The Creditor Trust will pay Allowed Class 3b Secured Tax Claims in full and in cash, or shall surrender the collateral securing their Claim in satisfaction of their Secured Tax Claim, on the later of: (i) as soon as practicable following the Effective Date; (ii) thirty (30) days after such claims become Allowed Secured Tax Claims; and (iii) such other time as may be agreed in writing between the Creditor Trust and the holder of the Allowed Class 3b Secured Tax Claim. |
| | The Plan Proponents estimate Allowed Secured Tax Claims are $0 as of the Confirmation Date. |
| | The estimated Allowed Secured Tax Claims are believed to have been satisfied. |
| | Class 3c consists of all Other Secured Claims. |
| | The Other Secured Claims are unimpaired under the Plan. The Creditor Trust will pay holders of Allowed Class 3c Other Secured Claims in full and in cash, or shall surrender the collateral securing their Claim in satisfaction of their Other Secured Claim, on the later of: (i) as soon as practicable following the Effective Date; (ii) thirty (30) days after such claims become Allowed Other Secured Claims; and (iii) such other time as may be agreed in writing between the Creditor Trust and the holder of the Allowed Class 3c Other Secured Claim. |
| | The Plan Proponents estimate Allowed Other Secured Claims are $0 as of the Confirmation Date. |
| | The Other Allowed Secured Claims are believed to previously have been paid in full. |
| **Unsecured Claims (Class 4)** | Class 4 consists of General Unsecured Claims arising prior to the Petition Date. |
| | General Unsecured Claims are impaired under the Plan. Each holder of an Allowed General Unsecured Claim will be deemed to hold an Unsecured Creditor Trust Interest on account of its allowed Class 4 claim. |
| | At this time, the Plan Proponents are unable to determine the amounts that will be distributed to holders of General Unsecured Claims. General Unsecured Claims in the amount of approximately $20 million have been filed by creditors or scheduled against the Debtors. However, Allowed General Unsecured Claims may be less, based on the Creditor Trustee's resolution of Avoidance Actions and claims reconciliation activities. |
| | The estimated percentage recovery of the Allowed General |

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

| | |
|---|---|
| | Unsecured Claims is Unknown. |
| **Equity Securities (Class 5)** | Class 5 consists of the Equity Securities. The holders of the Equity Securities will not receive a distribution under the Plan and all Equity Securities will be cancelled and terminated. The estimated percentage recovery with respect to the Equity Securities is 0%. |
| **Implementation of Plan** | The Plan will create a Creditor Trust funded by all remaining assets in the Estate, as well as a contribution from the Plan Funding Source with a value of $1.6 million. |
| **Substantive Consolidation** | The Confirmation Order will contain one or more provisions substantively consolidating the Estates into the Estate of PRM Family Holding Company, L.L.C. Except as otherwise provided in the Plan, such substantive consolidation will not (other than for purposes related to the Plan) cause any Debtor to be liable under the Plan for any claim for which it otherwise is not liable, and the liability for any such claim will not be affected by such substantive consolidation. On the Confirmation Date, any intercompany claims of Debtors against any other Debtors will be extinguished and cancelled. |
| **Vesting of Assets** | On the Effective Date, the assets of the Estates will be transferred to and vest in the Creditor Trust and be deemed contributed thereto, subject to the terms of the Plan. |
| **Effective Date** | The Effective Date will be a date identified in a pleading filed with the Court by the Plan Proponents after a final Order confirming the Plan, duly considering the requirements of the Code and the Plan Proponents' goal of satisfying administrative expenses and priority claims, while making a pro rata distribution to pre-petition unsecured creditors. |

## III.    VOTING AND CONFIRMATION PROCEDURES

Under the Bankruptcy Code, classes of claims that are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan. Classes of claims and interests that are not entitled to receive any distribution on account of their claims or interests are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan.

Under the terms of the Plan, the holders of Claims in Class 1, 2, and 4 are impaired and

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

- 9 -

are entitled to vote to accept or reject the Plan.

Votes on the Plan are not being solicited from holders of Claims in Class 3a, Class 3b and Class 3c, which are unimpaired and deemed to have accepted the Plan. Votes on the Plan are also not being solicited from holders of Equity Securities in Class 5. Holders of Equity Securities in Class 5 will receive no distribution under the Plan and, therefore, are deemed to have rejected the Plan.

### A. Voting Procedures

If you are entitled to vote to accept or reject the Plan, a ballot is enclosed for the purpose of voting on the Plan. Please carefully follow the instructions set forth in the ballot and vote and return your ballot(s), by first class mail, hand or overnight courier, to:

Freeborn & Peters LLP
Attn: PRM Balloting
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606-6677

**TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN 5:00 P.M. (CENTRAL STANDARD TIME) ON THE DEADLINE SET FORTH IN THE ORDER APPROVING THIS DISCLOSURE STATEMENT (THE "*VOTING DEADLINE*").**

**ANY BALLOT WHICH IS EXECUTED BUT DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR WHICH BOTH THE ACCEPTANCE AND REJECTION BOX IS CHECKED, WILL BE DEEMED TO BE AN ACCEPTANCE OF THE PLAN. ANY BALLOT THAT IS EITHER UNRETURNED BY THE VOTING DEADLINE OR IS RETURNED BUT NOT EXECUTED WILL BE CONSIDERED NULL AND VOID AND WILL NOT BE COUNTED.**

If you are a holder of a claim entitled to vote on the Plan and did not receive a ballot, received a damaged ballot or lost your ballot, or if you have any questions concerning the

Disclosure Statement, the Plan or the procedures for voting on the Plan, please call counsel for the Committee, Freeborn & Peters LLP, Attention: Thomas R. Fawkes, Esq., 312.360.6000.

## B.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing to determine whether the Plan meets the section 1129 requirements for confirmation (the "*Confirmation Hearing*").  Any party-in-interest may object to confirmation of the Plan.  The Confirmation Hearing has been set on the date and time set forth in the Notice of Confirmation Hearing.  Notice of the Confirmation Hearing has, or will be, provided to all holders of claims and interests and other parties-in-interest (the "*Confirmation Notice*").

Objections, if any, to confirmation of the Plan must:  (i) be in writing; (ii) state the name and address of the objecting party and the nature of the claim or interest of such party; (iii) state with particularity the basis and nature of any objection; and (iv) in accordance with Bankruptcy Rule 3020(b)(1), be filed, together with proof of service, with the Bankruptcy Court and served on the following parties so that they are received no later than 5:00 p.m. (Central Standard Time) on the deadline set forth in the Notice of Confirmation Hearing (the "*Objection Deadline*"), or such other date established by the Plan Proponents:  (a) counsel to the Committee, FREEBORN & PETERS LLP, 311 South Wacker Drive, Suite 3000, Chicago, Illinois 60606-6677 (Attn: Richard S. Lauter, Esq.) and SCHIAN WALKER, P.L.C., 1850 North Central Avenue, #900, Phoenix, Arizona 85004-4531 (Attn: Dale C. Schian, Esq.); (b) counsel to the Debtors, MESCH, CLARK & ROTHSCHILD,  PC, 259 N. Meyer Ave., Tucson, Arizona 85701 (Attn: Michael McGrath, Esq.); and (c) Office of the United States Trustee, 230 North First Avenue, Suite 204, Phoenix, Arizona 85003 (Attn: Larry L. Watson, Esq.).  **UNLESS AN OBJECTION TO PLAN CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

# IV. GENERAL INFORMATION

## A. Description and History of the Debtors' Business

### 1. The Debtors

PRM Family Holding Company, L.L.C. was formed on May 12, 2010, and is owned by the following: Michael A. Provenzano III Non-Grantor Trust owns a 29.8609% interest; Steven R. Provenzano Non-Grantor Trust owns a 19.5639% interest; Richard S. Provenzano Non-Grantor Trust owns a 19.5639% interest; Jeffrey C. Provenzano Non-Grantor Trust owns a 19.5639% interest; Survivor's Trust owns a 3.6896% interest; Pro's Ranch Markets Holding, Inc. owns a 4.2100% interest; and Pro and Sons Holding, Inc. holds a 3.5478% interest. PRM Family Holding Company, L.L.C. is the sole member of Prodigio Mercado, LLC, Pro's ABQ Ranch Markets, LLC, Pro's ELP Ranch Markets, L.L.C., Pro and Son's, LLC (CA) and Pro's Ranch Markets (CA), LLC. Pro's ELP Ranch Markets, L.L.C. is the sole member of Pro's ELP Ranch Markets Beverage Company, L.L.C.

Prodigio Mercado, L.L.C. was formed in 2003 and operated three Pro's Ranch Markets located at 5833 South Central Avenue, Phoenix, Arizona, 3223 West Indian School Road, Phoenix, Arizona and 3415 West Glendale Avenue, Phoenix, Arizona.

Pro's ABQ Ranch Markets, L.L.C. was formed in 2008 and operated two Pro's Ranch Markets located at 4201 Central Avenue NW, Albuquerque, New Mexico and 320 East Wyatt Drive, Las Cruces, New Mexico.

Pro's ELP Ranch Markets, L.L.C. was formed in 2006 and operated two Pro's Ranch Markets located at 703 North Zaragoza Road, El Paso, Texas and 10501 Gateway Boulevard, Suite 600, El Paso, Texas.

Provenzano's, L.L.C. was formed in 2001 and operated four Pro's Ranch Markets located at 5802 West Thomas Road, Phoenix, Arizona, 1602 Roosevelt Street, Phoenix, Arizona, 6730

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

- 12 -

West Camelback Road, Phoenix, Arizona and 1118 E. Southern Avenue, Mesa, Arizona.

Pro & Son's, L.L.C. (formerly Pro & Son's, Inc. formed in 1997) was formed in 2010 and hold title to intellectual property and related rights (tangible and intangible) owned by the Debtors.

Pro's Ranch Markets (CA), L.L.C. (formerly Pro's Ranch Market, Inc. formed in 1997) was formed in 2010 and was the central paymaster, manager, internal wholesaler, overseer of trucking and distribution, payor of all APS and provider of employees to all of the Debtors' stores.

### 2. The Debtors' Business Operations

Since 1982, the Debtors operated grocery stores commonly known as Pro's Ranch Markets, catering to a variety of ethnically diverse customers and Hispanic shoppers in the Southwest. There were seven stores located in the Phoenix, Arizona area, one store located in Albuquerque, New Mexico, one store located in Las Cruces, New Mexico and two stores located in El Paso, Texas. In addition, there was a warehouse and distribution facility in Phoenix, an office and distribution facility in Glendale, Arizona and a warehouse facility in Ontario, California.

Collectively, the Debtors employed approximately 2,274 full and part time employees. The employees performed a variety of critical functions related to the operation of the Debtors' business. The Debtors' weekly payroll was approximately $750,000.

### B. The Pre-Petition Secured Indebtedness

### 1. Bank of America

Pursuant to an Amended and Restated Credit Agreement dated July 1, 2011 (the "*Credit Agreement*"), Bank of America, N.A. ("*BofA*") and Grocers Capital Company ("*GCC*") agreed to provide a secured credit facility to the Debtors. Pursuant to the Credit Agreement, BofA provided

Freeborn & Peters LLP
Attorneys At Law
Chicago

- 13 -

a "Revolving Credit Facility" in the amount of $40,000,000 and GCC provided a "Term B Facility" in the amount of $5,000,000.

In conjunction with the Credit Agreement, Pro and Sons Holding, Inc., Pro's Ranch Markets Holding, Inc., Michael A. Provenzano, Jr., individually and as trustee of the Survivor's Trust of the Provenzano Family Trust, Michael A. Provenzano, III, individually and as trustee of the MAP III 2003 Grantor Trust and the MAP III 2003 Non-Grantor Trust, Steven R. Provenzano, individually and as trustee of the SRP 2003 Grantor Trust and the SRP 2003 Non-Grantor Trust, Richard S. Provenzano, individually and as trustee of the RSP 2003 Grantor Trust and the RSP 2003 Non-Grantor Trust and Jeffrey C. Provenzano, individually and as trustee of the JCP 2003 Grantor Trust and the JCP 2003 Non-Grantor Trust (collectively, the "*Guarantors*") guaranteed all loan obligations under the Amended and Restated Credit Agreement.

Subsequently, the Debtors, BofA and GCC entered into two series of amendments to the Credit Agreement, pursuant to which BofA and GCC waived certain events of default and amended and extended the Credit Agreement.

In connection with the amendments, the Guarantors entered into reaffirmations of their continuing guaranties.

The Debtors, BofA and GCC entered into forbearance agreements (the "*Forbearance Agreements*") on September 30, 2012 and October 17, 2012. Pursuant to the Forbearance Agreements, BofA and GCC agreed to forbear with respect to certain events of default and amended the Credit Agreement.

In connection with the Forbearance Agreements, the Guarantors entered into further reaffirmations of their continuing guaranties.

In connection with the Credit Agreement, the Debtors granted BofA and GCC a first priority security interest in substantially all of the Debtors' collateral, excepting certain of the

Debtors' assets, including (i) the Debtors' leasehold interests, and fixtures located, on the real property from which they operate; (ii) deposit accounts not held with BofA; or (iii) the Debtors' certificated vehicles and rolling stock (collectively, the "*BofA Collateral*"). In addition, Pro and Son's, LLC granted BofA a security interest in its trademarks.

Further, a Pledge Agreement was entered into on July 1, 2011, pursuant to which the Debtors' membership interests (but not the membership interests in PRM Family Holding Company, LLC) were pledged to BofA.

### 2. Unified Grocers, Inc.

Pro's Ranch Market (CA), LLC was a shareholder of Unified Grocers, Inc. ("*Unified Grocers*"). Unified Grocers provides merchandise to the Debtors pursuant to a Supply Agreement (terminated pre-petition). The Debtors owed Unified Grocers approximately $6.3 million as of the petition date for goods sold to the Debtors. In addition, a subsidiary of Unified Grocers, Grocers Capital Company ("*GCC*") lent the Debtors pursuant to a Loan Agreement approximately $8.3 million, secured by a collateral interest in the Debtors' assets, subordinate to the Credit Agreement with BofA. The debt owed by the Debtors to GCC was part of the Credit Agreement discussed above. GCC's collateral was the Debtors' Class A, Class B and Class E shares in the Unified Grocers cooperative, deposits with Unified Grocers and accrued patronage or dairy dividends. Pursuant to the Credit Agreement, GCC had a second position lien on the BofA Collateral, though it had no equity beyond BofA's senior Lien.

### 3. 97531 Lending, LLC

On or about May 24, 2013, 97531 Lending, LLC ("*97531*") provided $100,000 pursuant to its loan agreement with the aforementioned Debtors. The Debtors repaid 97531 in full from the proceeds of the CNG DIP Loan, discussed below.

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

- 15 -

## C. Events Leading to the Debtors' Filing for Chapter 11 Relief

On May 28, 2013 (the "*Petition Date*"), the Debtors commenced these Cases. No single event caused the Debtors to seek relief under chapter 11 of the Bankruptcy Code. Rather, the Debtors had experienced several events and circumstances, including the Debtors' lenders refusing to make further advances of funds and charging the Debtors forbearance fees, substantial consulting and attorney fees, and default interest, and although under-secured, BofA offset the Debtors' bank account pre- and post-petition. In the 90 days prior to the Petition Date, BofA swept approximately $992,431.72 from the Debtors' operating bank accounts and post-petition, swept approximately $140,655.14 on account of the Debtors' pre-petition debt from the Debtors' operating accounts.

Other factors contributing to the adverse and negative impact on the Debtors' business include:

- The decline of the U.S. domestic economy and the profound effect it has had on the Southwest;

- The loss of construction and other blue collar jobs throughout Arizona and New Mexico;

- The adverse, negative and chilling effect on the perception in the State of Arizona towards immigrants and Hispanics, including the passage of SB 1070;

- The increased competition from other industry grocery chains;

- The Debtors were effectively singled out for an immigration audit which no other competitor was subjected; and

- Since October 2012, the Debtors' relationship with BofA deteriorated.

///
///

# V.     THE CHAPTER 11 CASES[1]

As a consequence of the Debtors' commencement of the Cases, all actions and proceedings against the Debtors and all acts to obtain property from the Debtors were stayed under section 362 of the Bankruptcy Code.

## A.     Committee Participation in the Cases

Pursuant to section 1102(a) of the Bankruptcy Code, on July 2, 2013, the U.S. Trustee appointed the Committee, which is comprised of the following Creditors: (i) Valassis; (ii) G H Diary El Paso; (iii) All American Plastic & Packaging; (iv) Marcus Food Co.; and (v) Hidden Villa Ranch. The Committee retained Freeborn & Peters LLP as its counsel, with Schian Walker, P.L.C. as its local counsel and O'Keefe & Associates Consulting, LLC as its financial advisor.

Since the appointment of the Committee, the Committee has taken an active role in the Debtors' Cases. Consistent with its duties under section 1103 of the Bankruptcy Code, the Committee: (i) consulted with the Debtors on the administration of the Cases; (ii) investigated the validity, priority and extent of the liens and security interests of BofA and Unified Grocers/GCC in the Debtors' assets; (iii) investigated the acts, conduct, assets, liabilities and financial condition of the Debtors, the operation of their business and matters relevant to the Cases; (iv) contributed substantially with respect to the reconciliation of PACA and PASA Claims; (v) participated in the multi-party mediation and contributed to the formulation and execution of the global settlement; and (vi) drafted and formulated with the Debtors, the Plan, and this Disclosure Statement as amended and updated.

## B.     Relevant Chapter 11 Filings

**1.**     The Debtors filed various motions and applications on the first day of these Cases, including, among other things: (i) joint administration of the Cases; (ii) authority to

---

[1]     Section V of the Disclosure Statement is only a summary of the Debtors' Cases. For a full list of motions and pleadings filed, the Plan Proponents refer parties-in-interest to the dockets of the Debtors' Cases, which can be accessed through the Bankruptcy Court's PACER system (account required) at ecf.azb.uscourts.gov.

Freeborn & Peters LLP
Attorneys At Law
Chicago

continue using the Debtors' existing cash management system; (iii) authorization to pay certain pre-petition compensation and benefits owed to the Debtors' employees; (iv); authorization to establish procedures to determine PACA and PASA Claims; and (v) authorization to provide utilities with adequate assurance.  All of these first-day motions were approved by the Bankruptcy Court.

### 2.     Retention of Professionals.

The Court appointed to represent the Debtors:   (i) Mesch, Clark & Rothschild, P.C. as bankruptcy counsel; (ii) HS Capital Partners (formerly HG Capital Partners), as financial advisor; (iii) Gursey Schneider, as accountants; (iv) Landegger, Baron, Lavenant & Ingber, as special counsel; (v) The Cavanagh Law Firm, as special immigration and labor counsel; and (vi) Arizona Liquor Industry Consultants, as liquor license broker.

### 3.     Schedules and Statements.

Each of the Debtors' Schedules of Assets and Liabilities and Statement of Financial Affairs were submitted and filed with the Bankruptcy Court on June 20, 2013 (as may have been amended, the "*Schedules and Statements*").  The meeting of creditors under section 341(a) of the Bankruptcy Code was held on July 9, 2013, in Phoenix, Arizona, at which representatives of the Debtors were questioned by creditors, creditors' representatives and a representative from the Office of the United States Trustee.  Creditors are expressly referred to the Debtors' Schedules and Statements, as amended from time to time as necessary, on file in these proceedings for the purpose of becoming fully informed as to the assets, liabilities and financial affairs of the Debtors as of the Petition Date.

### 4.     Debtors' Motion to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §364(b) (DE 142)

On July 10, 2013, the Debtors filed a motion seeking the authority to borrow $1,000,000 from Michael A. Provenzano, Jr., Michael A. Provenzano, III, and Richard S. Provenzano (the

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

- 18 -

"*Provenzano 364 Motion*"), which funds were to be earmarked for the payment of the Debtors' Allowed Administrative Professional Fees. On October 31, 2013, a Notice of Term Sheet was filed on the record (Docket No. 549). A stipulation to allow the Debtors to hold these funds as a new value contribution from Michael A. Provenzano, Jr., Michael A. Provenzano, III, and Richard S. Provenzano was entered into on the record at the hearing held on November 13, 2013 (Docket No. 609).

While certain interested parties negotiated the form of order for the Provenzano 364 Motion, the Debtors began settlement discussions with its lenders, the Committee, and other interested parties as discussed below.  The case changed from the Debtors seeking to reorganize to the Debtors moving forward on a sale of substantially all of its assets pursuant to 11 U.S.C. §363. The Provenzano 364 Motion, while approved by the Court, never resulted in a signed order.

### 5. Motion to Use Cash Collateral, the Debtors' Chapter 11 Plan, the Trustee Motion and Global Settlement

a. The Bankruptcy Court entered several orders authorizing the use of cash collateral by the Debtors so as to allow the continued operation of their business (Docket Nos. 35, 63, 103, 106, 260, 325, 478, 520, 619, and 828).  Pursuant to the Docket No. 828, the Debtors were authorized to use the cash collateral of CNG (the successor in interest to BofA, See Section 6 below) through March 2, 2014.

b. On September 23, 2013, the Debtors filed their *Joint Plan of Reorganization* (Docket No. 382) (the "*Initial Plan*") and accompanying Disclosure Statement with the Bankruptcy Court.  The Initial Plan contemplated a reorganization of the Debtors through a recasting of the BofA indebtedness to the amount of the BofA Collateral and a substantial new value capital raise from the Guarantors and from new third-party investors.

c. Starting on November 5, 2013, the Debtors, BofA, Unified/GCC and the Committee participated in a mediation conducted by Susan Boswell, an attorney with the

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

law firm of Quarles & Brady LLP. During the mediation, CNG was identified as a potential purchaser for the Debtors' assets, and the mediation parties invested substantial time and resources crafting a global settlement that would entail (i) CNG's purchase of BofA's note; (ii) CNG's purchase of substantially all of the Debtors' assets in a private sale transaction through a credit bid and a substantial infusion of cash to satisfy the Debtors' administrative expenses; (iii) the waiver of certain claims by Unified/GCC; and (iv) mutual releases by and between CNG and the Guarantors.

        **d.**      Throughout November and December, CNG, the Committee, BofA, the Debtors, and Unified/GCC continued to have settlement discussions with Susan Boswell. The mediation successfully concluded with the filing of the (i) Debtors' *Motion for Order (A) Authorizing the Private Sale of Substantially All Assets Free and Clear; and (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases* (Docket No. 666) (the "*CNG Sale Motion*"); (ii) the Debtors' *Motion for Emergency Order: (A) Approving a Settlement Under Rule 9019; (B) Approving, a Stipulation Allowing Secured Claims and the Validity, Priority and Enforceability of Liens Under Section 502* (Docket No. 667) (the "*Settlement Motion*"); and (iii) the Debtors' *Motion To Obtain Emergency and Further Post-Petition Financing Pursuant to 11 U.S.C. § 364(c) and 11 U.S.C. § 105* (Docket No. 668) (the "*CNG DIP Motion*")

        **e.**      This global settlement was effectuated through the Bankruptcy Court's approval of three motions referenced in the immediately preceding paragraph: (i) the *CNG Sale Motion*; (ii) the Debtors' *Motion for Emergency Order: (*the *Settlement Motion*; and (iii) the *CNG DIP Motion*.

      **6.**      **CNG Sale Motion.**

        **a.**      On January 24, 2014, the Court approved the CNG Sale Motion.

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

Case 2:13-bk-09026-BKM    Doc 1321    Filed 12/30/14    Entered 12/30/14 11:29:47    Desc
Main Document    Page 22 of 54

Pursuant to the CNG Sale Motion, the Debtors sold substantially all of their assets to CNG in a private sale transaction, pursuant to an Asset Purchase Agreement (the "*CNG Asset Purchase Agreement*") for an aggregate price of $53.6 million (consisting of a credit bid of $39.6 million and a cash contribution of $14 million to the Debtors (the "*Plan Fund*"). The assets sold pursuant to the *Motion for Order Authorizing the Private Sale of Sustainably all of the Assets Free and Clear* . . . (Docket No. 666) specifically included "causes of action arising under Chapter 5 of the Bankruptcy Code against Bank of America or its successor, the Debtors and their Guarantors, including those arising under their loan documents, notes and security instruments." (pg. 10). As a result the Estates no longer have any avoidance action claims against the Provenzano family or their trusts. The Plan Fund (in addition to the Plan Funding Source and the liquidation of other Estate assets by the Creditor Trust) will allow payment of creditors according to the priority set forth in this Plan and the Bankruptcy Code.

    **b.**  The CNG Sale Motion also resolved the Debtors' outstanding issues with their largest unsecured creditor, Unified Grocers/GCC, including a claim secured by the Debtors' FF&E, inventory, and stock of $8,300,000, an asserted $3,000,000 §503(b)(9) claim, and a general unsecured claim in excess of $3,000,000. The Guarantors individually and on behalf of their Trusts delivered their executed secured promissory note of $7,200,000 in exchange for neither Unified Grocers nor GCC asserting a claim against the PRM bankruptcy estate.

    **c.**  The CNG Sale Motion assigned all claims against any insiders pursuant to 11 U.S.C. §547 or 11 U.S.C. §548 to CNG. CNG waived and agreed not to pursue any such claims at the time of the closing of the Sale.

    **d.**  A hearing on the CNG Sale Motion took place on January 28, 2014, pursuant to which the Bankruptcy Court granted the CNG Sale Motion, approving the private sale of the Debtors' assets to CNG. The CNG sale transaction closed on February 10, 2014.

**e.** Although the sale closed on February 10, 2014, the Debtors still needed to resolve several outstanding issues regarding secured claims, inventory, PACA, and tax issues to finalize the sale before CNG would allow the release of all sale funds from escrow.

**f.** The Debtors made payments of approximately $6,000,000 to all allowed PACA claims directly from escrow.

**g.** Beginning on March 6, 2014 and continuing through the date of this Disclosure Statement, CNG has been releasing escrow funds to the Debtors. As of the date of this Disclosure Statement, approximately $100,000 remains in the escrow account, and the Debtors estimate that approximately $25,000 of these escrow funds will ultimately be released to the Debtors.

**h.** It was originally estimated that post-closing, after payment of certain closing costs and other administrative expenses, approximately $4.75 million would remain for distribution to holders of 503(b)(9) Claims and General Unsecured Claims. However, the Asset Purchase Agreement between CNG and the Debtors provided for certain purchase price adjustments based on, *inter alia*, the Debtors' inventories and cash holdings as of the closing date. At closing, it was determined that there were significant deviations between anticipated and actual inventory and cash holdings at closing, as well as unanticipated additional postpetition accounts payable, which resulted in an effective reduction in the net sale proceeds of approximately $5.6 million. The amount realized was less than expected in part because CNG rejected certain inventory at and following the closing. In order to address the shortfall, the Provenzano family delivered their executed personal promissory note to CNG of approximately $2.4 million to mitigate the impact of the shortfall would have on anticipated distributions to creditors. Furthermore, the Provenzano family agreed to make an additional contribution to the estates, pursuant to the Plan, of $1.6 million in order to meet the Committee's goal to provide

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

some distribution to unsecured creditors.

**7.    CNG DIP Motion.**

**a.**    On February 27, 2014, the Court entered its *Final Order Authorizing Post-Petition Financing Pursuant to 11 U.S.C. § 364(c) and 11 U.S.C. § 105* (Docket No. 966), granting the CNG DIP Motion and approving the CNG DIP Loan.  The CNG DIP Loan has been paid in full from the proceeds of the sale.

## VI.    FINANCIAL INFORMATION

### A.    Assets

The Plan Proponents believe that the following assets, each of which will either be used to fund payments to be made under the Plan on the Effective Date or transferred to the Creditor Trust no later than seven (7) days after the Effective Date, will be available to fund distributions to Creditors in accordance with the Plan and the Creditor Trust Agreement (Exhibit C is a Sources and Uses chart based on a confirmed Plan):

**1.    Cash Held by the Debtors**.  As of December 1, 2014 the Debtors are currently holding Cash in the approximate amount of $21,679.  The Cash will be used by the Creditor Trust to make distributions to holders of Allowed Claim according to their respective priorities under the Plan.  Additionally, $100,000 remains in an escrow from the sale of the assets to CNG. Moreover, on or before the Effective Date, the Plan Funding Source will make, or cause to be made, directly or indirectly, a contribution (comprised of cash, post-petition loans to the estate, and acquired administrative priority claims based on the cost of acquiring such claims, rather than the face value of such claims) with a value of $1,600,000 to the Creditor Trust, to be used to satisfy administrative expense claims or for distribution to the beneficiaries of the Creditor Trust. As of December 1, 2014, all $1,600,000 has been utilized for post-petition loans to the estate, or to purchase administrative priority claims for a discount. In addition, the Plan

Funding Source is in the process of purchasing certain other administrative expense claims, which claims will not be waived, but will be retained and asserted against the Estate, for the purchase amount (rather than the face amount) of such claims.

> **2. Avoidance Actions Against Non-Insiders.** The Committee believes that the Creditor Trustee may be able to pursue claims against recipients of preferential transfers made in the ninety (90) days prior to the commencement of these Cases under section 547(b) of the Bankruptcy Code (the "*Avoidance Actions*"). Pursuant to the Debtors' Schedules and Statements, the Debtors made approximately $51 million in transfers to non-Insiders in the ninety (90) days prior to the Petition Date, some of which may be preferential transfers. Parties that received payments within the ninety days before the Petition Date are potential Avoidance Action targets a list of these parties is listed in paragraph 3(b) of the Debtors' Statement of Financial Affairs previously filed with the Court. Claims against the Bank, the Guarantors, and the members of the Provenzano family, were acquired by CNG as part of the sale of assets. The Committee has conducted a review of the Debtors' records and identified approximately $2,900,000 of potential avoidance action claims. The liquidation analysis conservatively projects that the Creditor Trust may net approximately $1,500,000 in recoveries. Additional information on this analysis may be received by contacting the Committee. As noted above, all pre-petition claims against Insiders, including avoidance actions, were transferred to CNG as part of the sale. Such claims are not assets of the Estate, nor available to fund a recovery to any creditor. On Exhibit B there is a projection of $750,000 recovery to the Estate from the participation in certain class actions described in the next paragraph.

> **3. Class Action Claims Held by Estates.** The Creditor Trust will pursue claims held by the Estates in several class action lawsuits. These class claims which the Creditor Trust will hold include claims against Visa/MasterCard, and for price-fixing in the tomato, potato,

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

chocolate, and information technology industries.  Such claims may be worthless or may provide recovery of millions of dollars for the Creditor Trust and its beneficiaries. Since certain of these claims, such as the Visa/MasterCard claims, trade in a secondary market, the Creditor Trust will evaluate the value of these claims and determine the best course of disposition for these claims.

4. **Other Causes of Action.** The Creditor Trustee may have additional causes of action against third parties that are unknown at this time. The Creditor Trustee will be empowered to investigate the Debtors' relationship with such other third parties for the purpose of evaluating potential additional litigation claims. The proceeds of any litigation against third parties, or any other beneficial result from the settlement of such litigation, would also be earmarked for distribution to holders of Allowed Claims under the Plan and the Creditor Trust Agreement. As noted above, all pre-petition claims against Insiders, including avoidance actions, were transferred to CNG as part of the sale. Such claims are not assets of the Estate, nor available to fund a recovery to any creditor.

**B.     Liabilities**

**1.     Secured Claims**

As noted above, the CNG Secured Claim has been satisfied by CNG's purchase of the Debtors' assets and credit bid of $39,800,000 pursuant to the CNG Asset Purchase Agreement. As a result of the Committee's and the Debtors' negotiation with CNG, and through the efforts of the Mediator, the CNG credit bid eliminated a potential unsecured claim of more than $15,000,000.

**2.     Administrative Claims**

**a.     Debtors' Professionals.**  As of the anticipated Confirmation Date, the Debtors' Professionals estimate that they will be owed approximately $225,000 for counsel,

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

and $50,000 for their financial advisor, with respect to accrued but unpaid Professional Fee Claims. This amount could increase should there be unanticipated litigation.

        **b.**     **Committee's Professionals.** As of the anticipated Confirmation Date, the Committee's Professionals estimate that they will be owed approximately $225,000 with respect to accrued but unpaid Professional Fee Claims. This amount could increase should there be unanticipated litigation.

        **c.**     **Other Administrative Expense Claims.** Other administrative expense claims (including 503(b)(9) Claims), but excluding claims waived by the Plan Funding Source, are estimated to be $1.6 million on the Effective Date.

        **d.**     **Paid Administrative Claims.** Since the inception of the case the Debtors have paid not less than $205,000,000 in administrative claims.

        **e.**     **Reconciled and Satisfied §503(b)(9) Claims.** The Provenzano family has committed $1.6 million (as previously described) to fund the Plan. With the concurrence of the Committee, and in an effort to satisfy administrative claims so as to allow a dividend for unsecured creditors, the family contributed not less than $850,000 post-sale to the Debtors to reconcile and satisfy certain administrative §503(b)(9) claims. As a result, the Estates have resolved approximately $1,400,000 in asserted §503(b)(9) Claims and other administrative priority claims with these funds.

        **f.**     **The MAPS Entity.** The Provenzano family also funded $750,000 into MAPS Acquisition Enterprise, LLC ("*MAPS*"). MAPS has and is continuing to purchase §503(b)(9) claims for a discount on the estimated allowed claim amount. Thus far, MAPS has acquired $1,156,000 of §503(b)(9) claims for $762,900. As part of this confirmed Plan the MAPS entity agreed to forgive its §503(b)(9) claims, based on the cost of acquisition, up to its total commitment of $1.6 million. Any and all claims acquired beyond such amount will be retained by

MAPS, to be paid pro-rata with other similar claims, based on the purchase amount (rather than the face amount) of such claims.

### 3. Priority Claims

a. **Priority Claims**. The Plan Proponents believe priority claims exist against the Debtors in the approximate amount of $523,000 arising primarily for tax claims of the State of Texas and Arizona. This figure is subject to further reconciliation or other adjustment by the Debtors, the Committee or the Creditor Trustee.

### 4. Unsecured Claims.

a. **General Unsecured Claims.** General Unsecured Claims in Class 4 total approximately $20 million, based upon the Schedules and Statements and the proofs of claim filed. However, Allowed Unsecured Claims may ultimately be less than this estimated amount, based on resolution of Avoidance Actions and claims reconciliation by the Creditor Trustee.

### 5. Equity Securities.

This class of interests consists of the Debtors' Equity Securities.

## VII. PLAN OF LIQUIDATION

### A. Objectives of the Plan

The primary objectives of the Plan are to: (i) transfer the remaining Estates' assets to the Creditor Trust, which will be charged with liquidating them, reconciling claims, prosecuting Avoidance Actions and other causes of action for the benefit of Creditors and making distributions to Creditors; and (ii) maximize value to all Creditor groups on a fair and equitable basis under the priorities established by the Bankruptcy Code and applicable law.

The Plan Proponents believe that the Plan provides holders of Allowed Claims with a more timely recovery of not less than the recovery they would receive without approval of the

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

- 27 -

Plan, or upon conversion of these cases to a chapter 7 liquidation.

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statements of such terms and provisions.

The Plan itself and the documents referred to therein control the actual treatment of claims against and interests in the Debtors, and will be binding upon all holders of claims against and interests in the Debtors upon the Confirmation Date. In the event of any conflict between this Disclosure Statement, on the one hand, and the Plan or any other operative document, on the other hand, the terms of the Plan and such other operative documents, including, without limitation, the Creditor Trust Agreement, are controlling.

**B.    Means of Implementation of the Plan**

**1.    Substantive Consolidation.**

**a.    Claims**.    The Confirmation Order will contain one or more provisions substantively consolidating the Estates into the Estate of PRM Family Holding Company, L.L.C. Upon the Effective Date, and except as otherwise provided in the Plan: (i) any obligation of any Debtor and all guaranties thereof executed by another Debtor or Debtors will be treated as a single obligation and any obligation of two or more Debtors, and all multiple Claims against such entities on account of such joint obligations, will be treated and allowed only as a single Claim against the consolidated Debtors; and (ii) each Claim against any Debtor will be deemed filed against the consolidated Debtors and will be deemed a single Claim against and a single obligation of the consolidated Debtors. Except as set forth in the Plan, such substantive consolidation will not (other than for purposes related to the Plan) cause any Debtor to be liable

under the Plan for any Claim for which it otherwise is not liable, and the liability for any such Claim will not be affected by such substantive consolidation. On the Confirmation Date, the Intercompany Claims of Debtors against any other Debtors will be extinguished and cancelled.

**b.** A creditor's vote to accept the Plan will be deemed such creditor's agreement to accept, as consideration for any and all allowed claims against any and all Debtors, the treatment specified in the Plan and, the treatment of such creditor's claim pursuant to the Plan on a non-substantive consolidation basis.

**c.** **Non-Effect**. The substantive consolidation effected pursuant to the Plan will not affect (other than for purposes related to funding distributions under the Plan): (i) the legal and organizational structure of the Debtors; (ii) defenses to any causes of action (including Avoidance Actions) or requirements for any third party to establish mutuality to assert a right of setoff; and (iii) distributions out of any insurance policies or proceeds of such policies.

**2.** **Vesting of Assets**. On the Effective Date, the assets of the Estates (including, without limitation, the contribution from the Plan Funding Source, the Plan Fund and all causes of action) will be transferred to and vest in the Creditor Trust and be deemed contributed thereto, subject to the terms of the Plan. All property held in the Creditor Trust for distribution pursuant to the Plan will be held solely in trust for the holders of Allowed Administrative Claims, Class 1 Claims, Class 2 Claims, and Class 4 Claims and will not be deemed property of the Debtors.

**3.** **Creditor Advisory Board**. Prior to the Effective Date, the Committee will select three (3) Creditors to serve on an advisory board (the "*Creditor Advisory Board*"). The duties of the Creditor Advisory Board shall be: (a) to select a successor Creditor Trustee in the event that the initial Creditor Trustee needs or is required to resign or is unable to complete its duties as Creditor Trustee; (b) to advise the Creditor Trustee with respect to his or her duties,

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

including the reconciliation of claims, distributions to beneficiaries of the Creditor Trust and Avoidance Actions; and (c) to file any necessary pleadings with the Bankruptcy Court challenging any actions of the Creditor Trustee as permitted under the Creditor Trust Agreement. The Creditor Trustee shall provide the Creditor Advisory Board with any Quarterly Reports.

**4.     Cancellation of Equity Securities**. On the Effective Date, all of the equity securities in the Debtors will be and are deemed to be cancelled and of no further force, whether surrendered or not. Upon receipt by the Debtors (or the Creditor Trust) of the Plan Funding Contribution with a value of $1.6 million from the Plan Funding Source, the Guarantor Release Parties are fully and forever released from any claims or causes of action held by the Debtors and the Creditor Trust.

**5.     Creditor Trust Asset Administration**. The Creditor Trustee will administer the Creditor Trust assets pursuant to the Plan and the Creditor Trust Agreement from and after the Effective Date.

**6.     Conditions to Confirmation**. The Confirmation Order must be reasonably acceptable in form and substance to the Plan Proponents.

**7.     Conditions to Effective Date**. The following are conditions precedent to the occurrence of the Effective Date, unless waived in writing by the Plan Proponents: (i) the Confirmation Order will be a final order and no stay will be in effect with respect thereto, (ii) the effectiveness of the Creditor Trust Agreement, and (iii) the collection of liquid funds required to make Effective Date payments. The Effective Date may not be more than 18 months following entry of a final Confirmation Order, unless otherwise ordered by the Court.

**8.     Administrative Claims Bar Date**. Notwithstanding anything to the contrary or alternative provided by prior orders of the Bankruptcy Court regarding allowance or payment of Professional Fee Claims, all Persons requesting payment of Administrative Claims

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

(Professional Fee Claims or Other Administrative Expense Claims) shall file applications for payment no later than sixty (60) days after the Effective Date of the Plan. Objections to such applications for payment, if any, must be written, filed with the Bankruptcy Court and served on the applicable parties within twenty-one (21) days after the filing deadline. Any Administrative Claims for which applications are not timely filed in accordance herewith will be deemed discharged and barred from being asserted against the Debtors; provided, however, that, previously approved or Allowed applications for Administrative Claims do not need to be re-filed, other than the filing of a final fee application with respect to Professional Fee Claims which an interim fee application has been filed; and provided, further, however, that no 503(b)(9) Claims filed after October 14, 2013 (the date by which 503(b)(9) Claims were required to be filed in these cases pursuant to the *Order Establishing Bar Date To File Claims and Establishing Procedures for § 503(b)(9) Claims* (Docket No. 305) will be allowed.

      **9.** **Termination of Committee**. The Committee will terminate automatically upon the Effective Date. Upon termination of the Committee, the Committee will be dissolved and its members shall be deemed released of their duties and responsibilities in connection with the cases or the plan and its implementation, and the retention or employment of the Committee's counsel will terminate, except for ministerial duties or any duties imposed pursuant to the Plan (including, without limitation, filing applications for allowance and payment of Claims for professional fees).

      **10.** **Case Administration**. From and after the Effective Date and continuing through the date that a final decree closing the cases is entered, the Creditor Trustee will possess the rights of the Debtors for all matters arising in, arising under or related to the cases. In addition to, and without limiting the generality of the foregoing, for all matters arising in, arising under or related to the cases, the Creditor Trustee will: (i) have the right to appear and be heard on matters

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

brought before the Bankruptcy Court or other courts of competent jurisdiction; (ii) access to the records of, or related to, the Debtors (without limitation, but shall be responsible to pay any actual cost related to accessing such records); (iii) be entitled to notice and opportunity for hearing; (iv) be entitled to participate in all matters brought before the Bankruptcy Court, including, but not limited to, adversary proceedings; (v) have exclusive standing to commence Avoidance Actions and other causes of action; (vi) be entitled to request the Bankruptcy Court to enter a final decree closing the Cases; and (vii) be entitled to receive notice of all applications, motions and other papers and pleadings set before the Bankruptcy Court in these Cases.

   **11.**   **Filing of Additional Documents**. The Creditor Trustee may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

   **12.**   **Creditor Trust Professionals**. Upon the Effective Date, the Creditor Trustee may retain such professionals as it may deem necessary to effectuate the Plan and the Creditor Trust Agreement. The professionals retained by the Creditor Trustee are not required to be "disinterested" as that term is defined in the Bankruptcy Code and may include, without limitation, counsel and financial advisors of any party in the cases. The Creditor Trustee's retention of any such Professionals is deemed not to pose any conflict of interest, and no conflict will exist by virtue of the filing of applications by professional persons for allowance of administrative claims.

   **13.**   **INJUNCTION**. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE CONFIRMATION DATE, EXCEPT AS OTHERWISE SET FORTH IN THE PLAN, ALL PERSONS AND ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD LIENS, CLAIMS OR INTERESTS IN OR AGAINST THE DEBTORS OR ANY OF THE DEBTORS ARE, WITH RESPECT TO OR ON

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

ACCOUNT OF ANY SUCH LIENS, CLAIMS OR INTERESTS, PERMANENTLY ENJOINED

FROM TAKING ANY ACTION AGAINST OR AFFECTING THE DEBTORS OR ANY OF

THEM OR THE CREDITOR TRUST OR ANY OF THEIR RESPECTIVE PROPERTY,

DIRECT OR INDIRECT TRANSFEREES, DIRECT OR INDIRECT SUCCESSORS IN

INTEREST, REPRESENTATIVES, AGENTS, OR PROFESSIONALS: (I) COMMENCING,

CONDUCTING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY

SUIT, ACTION OR OTHER PROCEEDING OF ANY KIND (INCLUDING, WITHOUT

LIMITATION, ANY PROCEEDING IN A JUDICIAL, ARBITRAL, ADMINISTRATIVE OR

OTHER FORUM); (II) ENFORCING AGAINST, LEVYING UPON OR ATTACHING

(INCLUDING, WITHOUT LIMITATION, ANY PRE-JUDGMENT ATTACHMENT); (III)

ENFORCING, LEVYING, ATTACHING (INCLUDING, WITHOUT LIMITATION, ANY

PRE-JUDGMENT ATTACHMENT), COLLECTING OR OTHERWISE RECOVERING BY

ANY MANNER OR MEANS WHETHER DIRECTLY OR INDIRECTLY, OF ANY

JUDGMENT, AWARD, DECREE, CLAIM OR ORDER; (IV) CREATING, PERFECTING OR

OTHERWISE ENFORCING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY

LIENS, CLAIMS OR INTERESTS OF ANY KIND; (V) OTHER THAN AS OTHERWISE

EXPRESSLY PROVIDED FOR IN THE PLAN, ASSERTING ANY RIGHT OF SETOFF,

SUBORDINATION OR RECOUPMENT OF ANY KIND, DIRECTLY OR INDIRECTLY,

AGAINST ANY OBLIGATION; AND (VI) TAKING ANY ACTIONS IN ANY PLACE AND

IN ANY MANNER WHATSOEVER THAT DO NOT CONFORM TO OR COMPLY WITH

THE PROVISIONS OF THE PLAN.

     **14.**    **Discharge**. Upon the Effective Date, any Person that has or could have had

a Claim that arose prior to the Confirmation Date shall be deemed to have forever waived,

released and discharged the Debtors, and each of them, from any and all Claims, rights and

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

liabilities. On the Effective Date, all such Persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such enjoined Claim against the Debtors, or any of them, or the Creditor Trust.

15. **Exculpation and Limitation of Liability**. Neither the Committee, the Debtors, the Creditor Trust, nor any of their respective members, officers, directors, shareholders, employees, advisors, attorneys or agents or representatives acting in such capacity, will have or incur any liability to, or be subject to any right of action by, any Person or entity, for any act or omission in connection with, relating to or arising out of, the Cases or the pursuit of confirmation of the Plan, except to the extent arising out of fraud, willful misconduct or gross negligence, and in all respects will be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under the Plan.

16. **Release for Plan Funding**. As a part of its purchase of the Estates assets, the Buyer, CNG, acquired all Chapter 5 avoidance claims against BofA, the Debtors and the Guarantors (the Provenzano family members and their Trusts (collectively the "*Insiders*")). Further, having made an investigation, the Committee does not believe and will not assert any claims against Insiders. In exchange for funding approximately $2.4 million for an inventory shortage required to close the CNG sale, satisfying the claims of Unified Grocers/GCC and affiliates by making payments and obligating themselves to a $7.2 million note, and making, or causing to make, directly or indirectly an additional contribution (comprised of cash, forgiveness of post-petition loans to the Estate, and the forgiveness of administrative claims against the Debtors purchased post-petition) in an amount of $1,600,000 (calculated using the purchase price of claims, rather than the face amount of such claims); (i) each holder of any claim against the Debtors, or any of them, shall be deemed to unconditionally and forever look to the Creditor Trust in full satisfaction of such claims, obligations, suits, judgments, damages, demands, debts,

rights, causes of action and liabilities whatsoever whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date against the Debtors, or any of them, their equity security holders, the Guarantors of any of the Debtors' obligations, MAPS Acquisition Enterprises, LLC and all of the above parties' respective members, managers, trustees, beneficiaries, officers, directors, shareholders, affiliates, professionals, employees, agents assigns and successors (collectively the "*Guarantor Released Parties*"). This provision shall not act to release any third party contractual guarantees against the Guarantor Released Parties, but includes all claims or causes of action that can be brought by or for the Estate.

17. **Quarterly Reports.** The Creditor Trustee will prepare and file with the Bankruptcy Court a report (each a "*Quarterly Report*") within thirty (30) days after the conclusion of every calendar quarter setting forth: (i) all distributions to Creditors during the calendar quarter; (ii) a summary of the Creditor Trust deposits and disbursements during the calendar quarter; and (iii) a summary of the Creditor Trust Assets. As used in this section, "calendar quarter" will mean a three month period of time, and the first calendar quarter will commence on the first day of the first month immediately following the occurrence of the Effective Date.

## VIII. STATUS AND EXISTENCE OF EXECUTORY CONTRACTS AND OTHER LITIGATION

A. **Executory Contracts**

1. **Contracts Deemed Rejected.** All executory contracts or unexpired leases of the Debtors that: (i) are not identified as being assumed in the Plan Supplement; (ii) have not

expired by their own terms; or (iii) have not otherwise been assumed or rejected prior to the Confirmation Date will be deemed rejected pursuant to section 365 of the Bankruptcy Code on the Confirmation Date.

    **2.**  **Bar Date for Rejection Damages**. All proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases pursuant to Section 6.2 of the Plan must, notwithstanding any other order of the Bankruptcy Court that may provide for a different date, be filed with the Bankruptcy Court not later than thirty (30) days after the Effective Date. The Claims of any Person arising from the rejection of executory contracts or unexpired leases pursuant to Section 6.1 of the Plan that fails to timely file a proof of claim will be discharged under section 1141(d) of the Bankruptcy Code and forever barred from assertion against the Debtors, the Creditor Trust, or their respective assets or Estates.

  **B.**  **Litigation**

    During the ninety (90) days prior to the Petition Date, the Debtors paid approximately $51 million to their non-insider creditors.  Claims against the Bank, the Guarantors, and the members of the Provenzano family, were acquired by CNG as part of the sale. Parties that received payments within the ninety days before the Petition Date are potential Avoidance Action targets a list of these parties is listed in paragraph 3(b) of the Debtors' Statement of Financial Affairs previously filed with the Court. The Committee has conducted a review of the Debtors' records and identified approximately $2,900,000 of potential avoidance action claims (the "*Non-Insider Preferential Transfers*"). The liquidation analysis conservatively projects that the Creditor Trust may net approximately $1,500,000 in recoveries. Additional information on this analysis may be received by contacting the Committee. The Creditor Trustee will be authorized to analyze and, if appropriate, file adversary proceedings under, *inter alia*, sections 547 and 550 of the Bankruptcy Code to avoid and recover the Non-Insider Preferential Transfers that have not been previously

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

consensually resolved.

These potential claims are not exhaustive, and if a specific cause of action or defendant it not identified herein, it is because such cause of action or defendant is not known to the Plan Proponents at this time. On behalf of the Debtors and Estates, rights to any cause of action that may be identified after the Effective Date shall be preserved for the Creditor Trustee. The recoveries, if any, from any litigation brought by the Creditor Trustee will depend on many factors, which cannot be predicted at this time. The Creditor Trustee may elect not to pursue certain causes of action (including Avoidance Actions), the pursuit of which the Creditor Trustee deems not to be in the best interest of the Estates or the Creditor Trust.

Except as specifically provided herein or in the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights, claims or causes of action (including Avoidance Actions) that the Creditor Trustee may choose to assert on behalf of the Estates or the Creditor Trust in accordance with any provision of the Bankruptcy Code or any non-bankruptcy law.

All causes of action shall survive confirmation and the commencement of prosecution of Causes of Action shall not be barred or limited by *res judicata* or estoppel, whether judicial, equitable or otherwise, based upon confirmation of the Plan. The Creditor Trustee's right to commence and prosecute causes of action (including Avoidance Actions) shall not be abridged or materially altered in any manner by reason of confirmation of the Plan.

Notwithstanding, any and all claims, actual or contingent, by the Estates, the Creditor Trustee, or the Creditor Trust, against any of the Guarantor Released Parties will be unconditionally and forever released upon confirmation, and are not being transferred to the Creditor Trust. The Creditor Trust shall have no rights of any kind or nature whatsoever, expressed or implied, statutory or common law, to investigate or prosecute any such claims

against the Guarantor Released Parties.

**C.    Objections to Claims**

The Plan Proponents believe that objections to certain claims will be warranted, and from and after the Effective Date, the Creditor Trustee will have authority to file, settle, compromise, withdraw or litigate to judgment objections to claims. The Creditor Trustee will have standing to file objections to such claims even if such Claims were scheduled by the Debtors as undisputed, liquidated and non-contingent. The Creditor Trustee may file objections to such claims prior to the commencement of distributions to a particular Class of Claims.

**IX.    CONFIRMATION AND CONSUMMATION PROCEDURE**

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the requirements of chapter 11, including, among other things, that: (i) the Plan has properly classified claims and interests; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Plan Proponents have complied with applicable provisions of the Bankruptcy Code; (iv) the Plan Proponents have proposed the Plan in good faith and not by any means forbidden by law; (v) the Plan has been accepted by the requisite votes of all classes of creditors (except to the extent that "cramdown" is available under section 1129(b) of the Bankruptcy Code); (vi) the Plan is in the "best interests" of all holders of claims or interests in an impaired class; (vii) the Plan is "feasible" in that confirmation of the Plan is not likely to be followed by the liquidation or need for further restructuring of the Debtors, unless the Plan contemplates liquidation; and (viii) all required fees and expenses have been paid or the Plan provides for the payment of such fees on the Effective Date or thereafter as the parties may agree.

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

**A.    Solicitation of Votes**

Under the Bankruptcy Code, only classes of claims and interests that are impaired under

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

- 38 -

the plan are entitled to vote to accept or reject a plan. A class is impaired if the legal, equitable or contractual rights to which the holders of claims or interests are entitled are modified, other than by curing defaults and reinstating the debt. Classes of claims and interests that are not impaired are conclusively presumed to have accepted the plan and are not entitled to vote on a plan. Classes of claims and interests whose holders will receive or retain no property under the plan are deemed to have rejected a plan and are not entitled to vote on a plan. Creditors who hold disputed or disallowed claims are not entitled to vote to accept or reject the plan.

Under the Plan, the holders of Allowed Claims in Class 4 are entitled to vote to accept or reject the Plan. All other classes of claims or interests are deemed under the Bankruptcy Code to have accepted or rejected the Plan. This Disclosure Statement and an appropriate ballot are being distributed to all holders of claims who are entitled to vote on the Plan.

Under the Bankruptcy Code, a class of claims accepts a plan if holders of at least two-thirds in dollar amount and more than one-half in number of the claims properly voted in that class, voted to accept.

A vote may be disqualified if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Any ballot that is properly completed, executed and timely returned to counsel to the Committee but does not indicate an acceptance or rejection of the Plan, or indicates both an acceptance and a rejection of the Plan, will be deemed to be a vote to accept the Plan. Whenever a creditor casts more than one ballot voting the same claim before the voting deadline, the last ballot received before the voting deadline is deemed to reflect the voter's intent and will therefore supersede any prior ballots. Creditors must vote all of their claims within a particular class under the Plan either to accept or reject the Plan and may not split their vote, and thus a ballot that

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

- 39 -

partially accepts and partially rejects the Plan will not be counted.

## B.    The Confirmation Hearing

The Confirmation Hearing is scheduled for the date and time set forth in the Confirmation Notice at the United States Bankruptcy Court at 230 N. First Ave., Suite 101, Phoenix, Arizona 85003.   At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code. Prior to the Confirmation Hearing, the Plan Proponents will submit a report to the Bankruptcy Court reflecting the votes received with respect to the acceptance or rejection of the Plan by the parties entitled to vote thereon.

Any party-in-interest may object to confirmation of the Plan. Any objection to confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served on all required parties on or before the objection deadline that has been set by the Bankruptcy Court. Unless an objection to confirmation is timely served and filed, it may not be considered by the Bankruptcy Court.

## C.    Confirmation

At the confirmation hearing, the Bankruptcy Court will confirm the Plan only if all of the applicable requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a plan are that the plan:  (i) has been accepted by all impaired classes of claims and equity interests or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class; (ii) is feasible; and (iii) is in the "best interests" of creditors and stockholders that are impaired under the plan and that vote, or are deemed, to reject the plan.

### 1.    Unfair Discrimination and Fair and Equitable Tests

To obtain confirmation of a plan over the objection of a class of claims or interests that rejects such plan, it must be demonstrated that the plan "does not discriminate unfairly" and is

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

- 40 -

"fair and equitable" with respect to each such non-accepting class. In order for a plan to be found to be "fair and equitable" and thus subject to confirmation by "cramdown" under section 1129(b) of the Bankruptcy Code, the Plan Proponents must demonstrate:

a. **For a Class of Unsecured Creditors**: That either: (i) each impaired unsecured creditor receives or retains, under the plan, property of a value equal to the amount of its allowed claim; or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan if claims in the dissenting class are not paid in full.

Holders of Equity Securities in Class 5 are presumed, under section 1126(g) of the Bankruptcy Code, to have rejected the Plan. The Plan Proponents request confirmation of the Plan under section 1129(b) of the Bankruptcy Code notwithstanding the deemed rejection of the Plan by Class 5. The Plan Proponents believe that the Plan may be confirmed by one class of impaired creditors.

2. **Best Interests Test**

With respect to each impaired class of claims and interests, confirmation of a plan requires that each holder of a claim or interest either: (i) accept the plan; or (ii) receive or retain under the plan property of a value, as of the effective date, that is not less than the value such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code. The Plan Proponents believe that holders of Impaired Claims and interests in each Impaired Class under the Plan would receive less under a chapter 7 liquidation than under the Plan over a lengthier period of time. This difference is represented in the liquidation analysis (the "*Liquidation Analysis*") attached hereto as **Exhibit B**. The liquidation analysis reflects that the Debtors under a Liquidating Chapter 11 Plan are administratively solvent and provide a potential recovery for unsecured creditors.

Freeborn & Peters LLP
Attorneys At Law
Chicago

Under this Plan, Chapter 11 administrative claims will receive the first distribution. However, under a Chapter 7 liquidation, these claims would be subordinated to Chapter 7 administrative expenses. Additionally, with the Provenzano family contribution and allowing the Creditor Trust to maximize the value of the assets in the Estate, it is projected there will be a potential recovery for general unsecured creditors under this Plan. A condition of the Provenzano family contribution is that a Plan will be confirmed that is anticipated to provide a dividend to unsecured creditors.

Under a Chapter 7 bankruptcy, there will be no recovery for unsecured creditors, and priority creditors, and chapter 11 administrative claims may not be paid in full.

Under this Plan the Creditor Trust will have assets totaling $2,371,679 including cash in the Debtor in possession account of $21,679, cash in the CNG sale escrow of $100,000, unliquidated litigation claims of $750,000, and avoidance claims of $1,500,000. Estimated administrative claims if the Plan is confirmed are $1,600,000.

To calculate the probable distribution to holders of each impaired class of claims and interests if a debtor was liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from such debtor's assets in a chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of the bankruptcy case. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as that of counsel and other professionals retained by the trustee, asset disposition expenses and all unpaid expenses incurred until the liquidation is

completed.

The Plan Proponents believe that the Plan meets the "best interests of creditors" test of section 1129(a)(7) of the Bankruptcy Code. The Plan Proponents believe that the members of each Impaired Class will receive greater value more quickly under the Plan than they would in a chapter 7 liquidation proceeding. The Plan will provide a more expeditious and greater recovery than under chapter 7 due to: (i) the value the Plan Proponents believe that the Creditor Trustee will bring to the Estates in reconciling overstated and invalid Claims and from avoidance actions and other causes of action; (ii) the Plan Funding Source providing a contribution with a value of $1,600,000 that would not be made in a chapter 7[2]; and (iii) by avoiding the additional expenses associated with conversion to a chapter 7 case, such is the liquidation process being undertaken by professionals with no familiarity with the assets, business and creditors of these cases.

The Plan Proponents submits that a significant distinction between the Plan and converting the cases to chapter 7 are the substantial chapter 7 administrative costs that will result from such conversion. Pursuant to section 326 of the Bankruptcy Code, the statutory chapter 7 trustee fee (the "*Chapter 7 Trustee Fee*") must not exceed 25% of the first $5,000 disbursed, 10% on any amount disbursed in excess of $5,000 but not in excess of $50,000, 5% on any amount disbursed in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3% on any amounts in excess of $1,000,000. Any such Chapter 7 trustee fee will directly reduce any recovery for creditors.

A chapter 7 trustee will likely also retain professionals for purposes similar to those retained by the Creditor Trustee. The chapter 7 trustee and his or her professionals, however, may be unfamiliar with the Debtors' operations and these cases. Given this reality, the Plan

---

[2] In a chapter 7 liquidation, the value of such contribution will be even greater because acquired administrative priority claims would participate in any distribution based on their face value, rather than the cost basis for acquiring such claim, which is 50% greater.

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

Proponents estimates that the fees of a chapter 7 trustee's professionals will exceed the fees of the Trustee's professionals, who will likely be professionals previously appointed by the Court in these cases.

The Plan Proponents submit that the Plan will provide a recovery that is greater than the amount each creditor would receive under a chapter 7 liquidation. The Creditor Trustee will retain professionals, but given the added expense of the chapter 7 trustee's professionals to become generally familiar with the Debtors' Estates, the Plan Proponents submits that the fees of any professionals of the Creditor Trust should be less than the professional fees of a chapter 7 trustee. Accordingly, the Plan meets the "best interests" test.

## X.    TAX CONSEQUENCES

The Plan Proponents are not qualified to advise creditors of the specific respective tax impact on each of them as a result of treatment provided in the Plan and therefore make no representation as to that. The Debtors are not expected to suffer adverse tax consequences as a result of the Plan.

In accordance with the Plan, holders of general unsecured claims will receive a distribution on such claims. Any holder of a general unsecured claim will realize a loss in an amount equal to such claim, minus any recovery, on an adjusted tax basis.

The tax consequences to holders of general unsecured claims will differ and will depend on factors specific to such holder, including but not limited to: (i) whether the claim, or a portion thereof, constitutes a claim for interest or principal; (ii) the origin of the claim; (iii) the type of consideration received in exchange for the claim; (iv) whether the holder is a United States person or a foreign person for tax purposes; (v) whether the holder reports income on the accrual or cash basis method; and (vi) whether the holder has taken a bad debt deduction or otherwise recognized a loss with respect to the claim.

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCE TO EACH HOLDER OF A CLAIM. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN MAY BE COMPLEX AND, IN SOME CASES, UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH HOLDER OF A CLAIM OBTAIN ITS OWN PROFESSIONAL ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH HOLDER OF A CLAIM AS A RESULT OF THE PLAN.

## XI.    RISK FACTORS

Holders of claims and interests against the Debtors should read and consider carefully the information set forth below, as well as other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference), prior to voting to accept or reject the Plan. This information, however, should not be regarded as necessarily setting forth the only potential risks involved in connection with the Plan and its implementation.

### A.    Failure to Satisfy Vote Requirement

In the event that sufficient votes accepting the Plan are not received and, as a result, the Plan is not confirmable, the Plan Proponents will assess the alternatives available, including: (i) amending the Plan; or (ii) converting these Cases to chapter 7 liquidation proceedings. There is a risk that either of these alternatives will result in less favorable treatment of claims than provided in the Plan.

### B.    Non-Consensual Confirmation

In the event any impaired class of claims does not accept the Plan, the Bankruptcy Court may nevertheless confirm such Plan at the Plan Proponents' request if at least one impaired class of claims has accepted the Plan if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such dissenting Impaired Class(es). The Plan Proponents believe that the Plan satisfies these requirements, although there

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

can be no assurances that the Bankruptcy Court will make the findings necessary to reach this result.

### C. Risk of Non-Occurrence of the Effective Date

Although the Plan Proponents believe that if the Plan is confirmed, the Effective Date will occur soon after the Confirmation Date of the Plan, there can be no assurance that all conditions to the occurrence of the Effective Date will occur. In the event the Effective Date does not occur, the Plan Proponents will assess the alternatives available to them at that time.

### D. Risk of Inability to Pay All Allowed Priority Tax Claims and Allowed Administrative Claims

The possibility exists that the Creditor Trustee will not have or obtain sufficient cash to pay allowed Administrative Claims (the amount as agreed to with respect to Professional Fees Claims, Allowed 503(b)(9) Claims), Allowed Priority Tax Claims, Allowed Secured Tax Claims and Other Allowed Secured Claims pursuant to the terms of the Plan.

To the extent there is insufficient cash to pay in full all Administrative Expense Claims, the Plan will not be feasible.

### E. Amount of Allowed Claims

The total amount of all claims may materially exceed the estimated amounts of allowed claims assumed in the development of the Plan and in this Disclosure Statement. The amount and timing of the distributions that will ultimately be received by any particular holder of an allowed claim in any class may be materially and adversely affected if the estimates are exceeded as to any class.

### XII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Plan Proponents believe that the Plan affords holders of claims the potential for the greatest recovery and, therefore, is in the best interests of such holders.

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

If, however, the requisite acceptances are not received, or the Plan is not confirmed and/or consummated, the theoretical alternatives include: (i) formulation of an alternative plan of liquidation; or (ii) liquidation of the Debtors and their Estates under chapter 7 of the Bankruptcy Code.

### A.  Alternative Plan(s) of Liquidation

If the Plan is not confirmed, the Plan Proponents or any other party may attempt to formulate and propose a different plan or plans of liquidation. The Debtors could suffer from liquidity issues during an extended chapter 11 process while another plan of liquidation is formulated and confirmed.

The Plan Proponents believe that the Plan enables creditors to realize the greatest possible value under the circumstances and, compared to any other or later alternative plans, has the greatest likelihood of being confirmed and consummated.

### B.  Chapter 7 Liquidation of the Debtors

If no plan is confirmed, the Debtors may be forced to liquidate under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtors' assets for distribution to creditors in accordance with the priorities established by the Bankruptcy Code. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of claims against or interests in the Debtors.

The Plan Proponents believe that in a liquidation under chapter 7, before creditors received any distribution, additional administrative expenses related to the appointment of a trustee and the trustee's attorneys, accountants and other professionals would cause a substantial diminution in the value of the Debtors' Estates. The assets available for distribution to creditors would be reduced by such additional expenses and by claims, some of which would be entitled to priority. The Liquidation Analysis, discussed in Section IX.C.2 (the "best interests test"), and

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

attached as Exhibit B hereto, suggests that unsecured creditors would receive *de minimis* distributions on their Claims in a liquidation.

## XIII.   CONCLUSION

The Plan Proponents submit that under the Plan, holders of claims stand to receive a meaningful recovery on their claims, while at the same time avoiding the additional fees and expenses that would be incurred upon conversion to chapter 7. The Plan Proponents believe that the distributions provided in the Plan are fair and equitable, and the Plan Proponents strongly recommend acceptance of the Plan.

If you are eligible to vote on the Plan, please do so by completing and returning the enclosed ballot.

Dated this 30th day of December, 2014.

OFFICIAL COMMITTEE OF UNSECURED CREDITORS

By:  /s/ Richard S. Lauter, with permission
    One of Its Attorneys

Richard S. Lauter, Esq. (Illinois Bar No. 6182859)
Thomas R. Fawkes, Esq. (Illinois Bar No. 6277451)
FREEBORN & PETERS LLP
311 South Wacker Drive, Ste. 3000
Chicago, IL  60606
*Counsel to Official Committee*
*of Unsecured Creditors*

and

PRM FAMILY HOLDING COMPANY, L.L.C., *ET AL.*

By:  /s/ Frederick J. Petersen, #19944
    One of Its Attorneys

Michael McGrath, #6019
Frederick J. Petersen, #19944
MESCH, CLARK & ROTHSCHILD, P.C.
259 North Meyer Avenue
Tucson, AZ 85701
*Counsel for PRM Family Holding Company, L.L.C., et al.*

21J2326

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

- 48 -

1

**LIST OF EXHIBITS**

2

3    Exhibit A……………………………....…...Joint Plan of Liquidation Dated December 30, 2014

4    Exhibit B………………………………………………….………...Liquidation Analysis

5                                                                                          (To be filed subsequently)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

- 49 -

**Exhibit A**

**See**

**Debtors' Joint Plan of Liquidation**

**Dated December 30, 2014**

**at Docket Entry No. 1320**

FREEBORN & PETERS LLP
ATTORNEYS AT LAW
CHICAGO

1

**Exhibit B**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Freeborn & Peters LLP
Attorneys At Law
Chicago

- 51 -

## Liquidation Analysis - Chapter 11

**As of 12/09/2014**

| | | |
|---|---|---:|
| Cash - AZ Biz Bank | $ | 21,679 |
| Cash - MAPS | $ | - |
| Cash - BK Escrow | $ | 100,000 |
| plus | | |
| Unliquidated Visa/MC settlement estimate per outside consultant | $ | 750,000 |
| Avoidance Claims estimate per Unsecured Committee Counsel | $ | 1,500,000 |
| Total Sources | $ | 2,371,679 |
| less | | |
| Outstanding checks | $ | (1,602) |
| Post petition A/P | $ | (10,000) |
| Professional Fees | $ | (500,000) |
| 503B9 | $ | (987,037) |
| Administrative wrap up | $ | (20,000) |
| Tax Return Preparation Fee 2013/2014 | $ | (169,349) |
| FFE Sales Tax (estimate) | $ | (75,000) |
| Total USES | $ | (1,762,988) |
| Net after clearing Admin claims | $ | 608,691 |
| Priority Claim-Pre Petition Sales Taxes | $ | (523,000) |
| Total remaining for General Unsecureds | $ | 85,691 |

## Liquidation Analysis - Chapter 7

**As of 12/09/2014**

| | | |
|---|---|---:|
| Cash - AZ Biz Bank | $ | 21,679 |
| Cash - MAPS | $ | - |
| Cash - BK Escrow | $ | 100,000 |
| plus | | |
| Unliquidated Visa/MC settlement estimate per outside consultant | $ | 300,000 |
| Avoidance Claims estimate per Unsecured Committee Counsel | $ | 1,500,000 |
| Total Sources | $ | 1,921,679 |
| less | | |
| Outstanding checks | $ | (1,602) |
| Post petition A/P | $ | (10,000) |
| Professional Fees | $ | (345,000) |
| 503B9 | $ | (2,134,918) |
| Administrative wrap up | $ | (35,000) |
| Tax Return Preparation Fee | $ | (125,543) |
| FFE Sales Tax (estimate) | $ | (75,000) |
| Trustee Fees | $ | (100,000) |
| Chapter 11 Admin Claims | $ | (500,000) |
| Total USES | $ | (3,327,063) |
| Net after clearing Admin claims | $ | (1,405,384) |
| Priority Claim-Pre Petition Sales Taxes | $ | (523,000) |
| Total remaining for General Unsecureds | $ | (1,928,384) |